# L. B. NEEDHAM, Administrator c/t/a et al. v. WILLIAM CECIL DOYLE.—286 S. W. (2d) 601.

Western Section. September 15, 1955.

Petition for Certiorari denied by Supreme Court, February 3, 1956.

Holmes & Holmes, of Trenton, for L. B. Needham, administrator, c. t. a.

W.R. Landrum, of Trenton, for Boyd Moore.

W. R. Kinton, Sr., Trenton, for William Cecil Doyle.

BEJACH, J. This cause involves an appeal by L.B. Needham, administrator c/t/a under the will of William

H. Needham, deceased, and of Boyd Moore, claiming to be a beneficiary under said will, from the judgment of the Circuit Court of Gibson County, Tennessee, which granted a peremptory instruction holding said will invalid. The cause was certified to the Circuit Court of Gibson County by the County Court of Gibson County for probate of the will in solemn form. This certification was the result of a petition filed February 4, 1953 by William Cecil Doyle, which petition is sworn to by Doyle. This verified petition alleges that at the August term of the County Court, a paper writing purporting to be the last will and testament of William H. Needham, deceased, was admitted to probate in common form, and that L. B. Needham was appointed administrator with the will annexed, November 29, 1951. The petition alleges that the legatees and devisees under said paper writing are petitioner, William Cecil Doyle and Mrs. Lou Della Needham, who died prior to the death of testator, William H. Needham, and who left as her only child, Boyd Moore, of Bradford, 14th Civil District of Gibson County, Tennessee who claims the portion of the estate bequeathed to his mother, Mrs. Lou Della Needham.

The petition charges that said instrument is not the will of the said William H. Needham, deceased, because after the death of the said Lou Della Needham, the said William H. Needham revoked the clause in said will in which he bequeathed unto her his personal property with the exception of a few articles of small value, by written instrument to which he affixed his signature, and that said paper writing is not the last will and testament of the said William H. Needham, deceased, and that said clause in said paper writing was revoked and adeemed in the lifetime of the said William H. Needham.

The petition prays, "That process issue to compel the said L. B. Needham, administrator with the will annexed, and Boyd Moore, both of whom live in Gibson County, Tennessee, to appear at the next term of this Court, and answer this petition; that petitioner be permitted to contest said will, and that the fact of the contest, together with said original paper writing, be certified to the Circuit Court of Gibson County, at Trenton, Tennessee, to the end that an issue be there made to try the validity of the same." The petition is verified by William Cecil Doyle before a Notary Public in Brazos County, Texas, he being in the service of the United States in the Air Corps at that time, and being there stationed at that time, as well as at the time of the trial of this cause in the Circuit Court. Pertinent parts of the order of the County Court are quoted, as follows:

"William Cecil Doyle having filed his petition in this Court showing that he is one of the heirs and distributees of William H. Needham, deceased, and praying that he be allowed to contest the validity of the paper writing admitted to probate at the August term, 1952, of this Court, as the last will and testament of the said William H. Needham, deceased; * * * It is ordered by the Court that the Clerk make out and certify a complete transcript of the record and proceedings in this Court and transmit the same, together with the original instrument admitted to probate as the will of William H. Needham, deceased, as aforesaid, and the prosecution bonds entered into by the parties to the Circuit Court of Gibson County at Trenton, Tennessee."

The alleged will of William H. Needham, deceased, is in the words and figures, as follows:

"Last Will and Testament
of William H. Needham.

"I, William H. Needham of Milan, R.F.D. 3, Gibson County, Tennessee, being of disposing memory, do make this as my last will and testament thereby revoking any and all former Wills by me at any time made.

"Item 1. I direct that all my just debts, including funeral and burial expenses, and expenses of administration, be paid by my Executor out of the first moneys that may come into her hands.

. "Item 2. I give, devise and bequeath to my wife Lou Della Needham, the use of my farm where we now live as long as she remains my widow, with the definate request and demand that she keeps the Fire Insurance and State and County Tax paid each year as they become due and collectable, I also give and bequeath to my said wife Lou Della Needham, all the personal property that I may die possessed of money Notes, Bonds, or what ever it may consist of, except One dresser hereinafter described by Item 3. at the time of my said wife's remarriage if at any time, or at her death, my said farm located in the 13th civil district of Gibson County and where we now live, my Grand Son, William Cecil Doyle is to become in possession of the farm in fee simple.

"Item 3. I devise and bequeath to my Grand Son William Cecil Doyle One Oak Dresser, which dresser has been in my home for many years, and which dresser I desire that he have it immediately upon my death.

"Lastly: I hereby nominate and appoint my said wife Lou Della Needham my sole executor, without Bond, and if it does not interfere with the Laws of

the State that she not be required to make any statement to the Court other than the simple filling (sic) of this my last will and testament.

"In witness whereof I have hereunto set my hand this the 4th day of May, 1945.

"William H. Needham

"Signed by the said William H. Needham, as and for his last Will and testament, in the presence of us the undersigned, who, at his request, and in his sight and presence, have subscribed our names hereto as attesting witnesses, the day and date above written.

"Ralleigh McCoy

"S. L. Frazier."

After the cause had reached the Circuit Court of Gibson County, on August 10, 1954, L. B. Needham, administrator c/t/a, and Boyd Moore filed a declaration which is as follows:

"The plaintiff produces in open court a writing purporting to be the last will and testament of W. H. Needham, deceased, dated ——, and avers that same is the last will and testament of said W. H. Needham, deceased, and offers to prove the same in solemn form."

To this declaration the defendant, William Cecil Doyle, filed on August 13, 1954, a plea or pleas, as follows:

"The defendant, William Cecil Doyle, for plea to the declaration filed in this cause says that said paper writing is not the last will and testament of the said William H. or W. H. Needham, deceased, and demands a jury to try the cause.

"And for further plea the said William Cecil Doyle says that if the will is found to have been executed so as to be probated under the laws of the

State of Tennessee, the second item of said will as propounded, in which the said W. H. Needham bequeathed certain personal property to his wife, who died prior to his death, was revoked and adeemed by the said W. H. Needham in his lifetime, and also demands a jury to try the cause."

Proponents of the will made a motion to strike the pleas of the defendant, said motion being based upon the contention that the petition of William Cecil Doyle, filed in the County Court and sworn to by him, created a judicial estoppel which would prevent a general contest of the validity of the will by him,—the position taken by proponents in that regard being, that he conceded the validity of the will except as to the disposition of personalty, which he claimed had been revoked, and that he was judicially estopped by his sworn petition to make a general contest of the validity of the will. The defendant, Doyle, then presented an affidavit which shows that he had learned of the ground for attacking the will in its entirety, only a day or two before the trial; and explained his earlier lack of information on that subject by reason of the fact that he was in the Air Corps of the United States. His counsel made a motion to remand the cause to the County Court so that the petition could there be amended. After considerable argument by counsel, the trial judge declined to remand the cause to the County Court, but did allow in the Circuit Court an amendment to the petition filed in the County Court so as to establish a general contest of the will on the issue of devisavit vel non. After a jury was empanelel, the testimony of the two subscribing witnesses to the will, S. L. Frazier and Ralleigh McCoy, were offered before the jury. Part of the testimony of the two subscribing witnesses, S. L. Frazier and Ralleigh McCoy,

which we deem material to the issues of this cause, is quoted, as follows:

From direct examination of S. L. Frazier by Mr. Holmes:

"Q. 5. Did you know Mr. W. H. Needham during his lifetime? A. Yes.

"Q. 6. I will ask you whether or not you had occasion to sign his will as a witness? A. Yes, sir.

"Q. 7. Mr. Frazier, I will ask you to look at the signatures on this page and the second one appears to be 'S. L. Frazier'. I will ask you if that is your signature? A. I think it is, yes, sir.

"Q. 8. This will is dated back in 1945. Do you remember that as being about the time you signed this will? A. I just don't remember.

"Q. 9. Just don't remember about the time? A. No.

"Q. 10. Where were you when you signed the will? A. Over at Mr. Henry Webb's office.

"Q. 11. Was Mr. Henry Webb's office at that time in Milan? A. Yes, sir.

"Q. 12. And that is where you were when you signed the will? A. Yes.

"Q. 13. How did you happen to go to Mr. Webb's office? A. I was over there at the Farmers-Peoples Bank in Milan and him and Rolleigh McCoy came in there and wanted—

"Q. 14. By 'him' who do you mean, Mr. Needham? A. Mr. Willie Needham.

"Q. 15. And Rolleigh McCoy? A. And Rolleigh McCoy came in there and he told me he wanted me to sign his will, yes, sir, him and—

"Q. 16. Now, you say that was in the Farmers-

Peoples Bank? A. Yes, that was where I was at when they come over there.

"Q. 17. Was Mr. Rolleigh McCoy with him at the time? A. Yes, sir.

"Q. 18. And you say he asked you if you would sign his will? A. Yes, sir.

"Q. 19. Did he ask you to go over in Mr. Webb's office with him to do it? A. Yes, sir, we went across the street.

"Mr. Kinton: Don't lead.

"Q. 20. I will ask whether or not you did go to Mr. Webb's office then? A. Yes, we went to Mr. Webb's office.

"Q. 21. I will ask you whether or not you signed the will? A. Yes, I did.

"Q. 22. I will ask you whether or not—

"Mr. Kinton: Ask what he did.

"Q. 23. I will ask you to state whether or not Mr. Needham signed the will? A. I think he had done signed it, as well as I remember.

"Q. 24. I beg your pardon? A. I guess he had done signed it.

"Q. 25. What do you mean? A. His will.

"Q. 26. Well, you mean he signed it before you did or after you did? A. He signed it before I did, I reckon.

"Q. 27. Before you did? A. Yes, sir.

"Q. 28. I will ask you whether or not Mr. McCoy signed it? A. I reckon he did. I didn't see him sign it. I guess he had done signed it.

"Q. 29. You didn't see Mr. McCoy sign it? A. No, I didn't. He might have done signed it—I don't know.

"Q. 30. Did he go with you at the time? A. Across the street?

"Q. 31. Did he go up to the office with you? A. Yes, he went in the office with me.

"Q. 32. What I mean is this: I believe you say Mr. McCoy and Mr. W. H. Needham were together when they came to the bank and Mr. Needham asked you to go sign his will. Did you all go up to Mr. Webb's office together then? A. Yes, sir.

"Q. 33. You did. And that is where you signed it? A. Yes, sir."

Pertinent parts of the testimony of the other subscribing witness to the will, Ralleigh McCoy, are as follows:

"Q. 4. I show you a signature here, 'Rolleigh McCoy', and ask you if that is your signature? A. Yes.

"Q. 5. This document is dated back in May of 1945. Do you recall it as being about that time that you witnessed Mr. Needham's will? A. In '45—I wouldn't say just what year or month.

"Q. 6. I will ask if it has been seven or eight or nine years ago? A. A good long while.

"Q. 7. Where were you when you witnessed this will? A. Henry Webb's office.

"Q. 8. Henry Webb's office, did you say? A. Yes.

"Q. 9. Is that in Milan, Tennessee? A. That is right.

"Q. 10. At whose request did you witness it? A. Mr. Needham's.

"Q. 11. Do you recall who, if anybody else, witnessed it? A. Yes.

"Q. 12. Who was that? A. Stevie Frazier.

"Q. 13. Is Stevie and S. L. Frazier one and the same? A. That is right.

"Q. 14. That is the .same Mr. Frazier who testified here just now? A. That is right.

"Q. 15. And I believe you said you were in Mr. Henry Webb's office in Milan? A. That is right.

"Q. 16. Do you recall—did you and Mr. Needham and Mr. Frazier all go to Mr. Webb's office at the same time or separate times? A. Same time.

"Q. 17. Was that the time you witnessed the will? A. Yes.

"Q. 18. Was that the time Mr. Frazier witnessed the will? A. That is right.

"Q. 19. I will ask you whether or not Mr. Needham signed it there in your presence and Mr. Frazier's presence? A. Yes.

"Q. 20. Did you sign next? A. Well, I don't know which one, whether I signed, Stevie or which one.

"Q. 21. I will ask whether you both signed right there at the same time? A. Yes.

"Q. 22. In each other's presence? A. Yes, that is right.

"Q. 23. And in the presence of Mr. Needham? A. Yes, sir.

"Q. 24. Did you know Mr. Needham pretty well during his lifetime and back at that time? A. Yes, sir.

"Q. 25. Was he at that time a man of sound mind? A. I would think so—sure do.

"Q. 26. About what was his age, roughly—we are not— A. At that time he was, imagine, he was up in sixty.

"Q. 27. Around sixty at that time. Now, do you

recall where you were when Mr. Needham asked you to come witness this document? A. Out there on the street there in Milan—I wouldn't say just where.

"Q. 28. Do you recall whether or not you and Mr. Frazier were together at the time? A. I wouldn't say.

"Q. 29. But you were together when you went up in Mr. Webb's office? A. That is right.

"Q. 30. Do you remember, Mr. McCoy, whether or not Mr. Needham found you first and you then went into the Farmers-Peoples Bank and found Mr. Frazier? A. I wouldn't say about that.

"Q. 31. It has been a good while ago—you don't remember for certain about that? A. No.

"Q. 32. Mr. Henry Webb is dead now, isn't he? A. Yes."

On cross examination Mr. McCoy testified as follows:

"Q. 1. Mr. McCoy, you remember about two weeks ago or maybe three weeks ago Mr. Jake Doyle and I came to your home and talked to you? A. Sure do.

"Q. 2. With reference to a claim that had been filed here, if you knew anything about that, and we went out into the yard and you said, 'a funny thing happened, I didn't know I was signing a will when I signed that instrument'? A. I didn't tell you that.

"Q. 3. You didn't say that or that in substance? A. No, sir.

"Q. 4. And that when we got around near the car, didn't you say this or this in substance— A. Sure didn't. I told you—

"Q. 5. I haven't asked you yet. This or this in substance: A. Do what?

"Q. 6. This or this in substance happened: That

Mr. Needham said 'sign this' and you signed it—
A. That is right.

"Q. 7. And you didn't know what you signed?
A. Just know what I signed, he told me after.

"Q. 8. You didn't know what you signed?

"Court: He told you after what? A. After I
signed it it was his will.

"Q. 9. How long was it after that? A. I wouldn't
say.

"Q. 10. Wasn't it a week? A. I wouldn't say.

"Q. 11. Didn't you say the next time you saw
him in town? A. I wouldn't say whether in town or
down in the store or where.

"Q. 12. He didn't tell you at that time it was his
will? A. I wouldn't say.

"Mr. Landrum: Give him time.

"Q. 13. Didn't you say on that day he didn't tell
you it was his will? A. He told me he wanted me to
sign a paper—

"Mr. Holmes: Go ahead. A. I wouldn't say—he
said to sign the paper. I wouldn't say he said come
and sign a will. I signed the paper there in his office
and in a few days—I don't know just how long it
was—he asked me did I know what I signed and he
told me it was a will.

"Q. 14. And when you talked to him the next time
didn't you say you didn't but hoped it wasn't a bad
check? A. Something like that.

"Q. 15. That was some days after it was signed?
A. I wouldn't say how many days—it was some
days."

On re-direct examination by Mr. Holmes, Mr. McCoy
testified, in part, as follows:

"Q. 5. First, I will ask you this, Mr. McCoy:

Do you recall, whether he said it directly to you or not, but do you recall whether or not Mr. Needham asked Mr. Frazier to come with him and sign his will? A. Well, he went, he was in there. I figure he did.

"Q. 6. I mean when you found him on the street? A. Well, I wouldn't say what he said to him about it.

"Q. 7. You don't remember whether he did say 'come witness my will' or not? A. Just saying 'will'—I don't know what he said.

"Q. 8. I believe you say you went up in Mr. Henry Webb's office? A. That is right.

"Q. 9. Was Mr. Webb there? A. That is right.

"Q. 10. Did Mr. Webb say anything about what it was, where to sign? A. I wouldn't recall whether he said anything or just put the paper out there and wanted me to sign it.

"Q. 11. I believe you say Mr. Needham signed it first? A. Well, I just won't say which one signed it first or last. We just all signed the paper. I just wouldn't say which one signed first, last or how.

"Q. 12. Was anything said about it being a mortgage or note or anything of that sort? A. No, sir.

"Mr. Kinton: (Objection)

"Court: Go ahead.

"Q. 13. Just why did you sign the paper? A. He just asked me to.

"Q. 14. Well, in asking you was there anything he said or did to let you know or understand or believe that you were signing a will for him?

"Mr. Kinton: I object—let him tell what happened.

"Court: Wait a minute. I believe that would be better, Mr. Holmes. Objection sustained.

"Q. 15. All right. Had you ever signed any other papers for him? A. No.

"Q. 16. Did you read—now, did you read it? A. No.

"Q. 17. Did you look at any part of it? A. No—just placed there to sign and I signed it.

"Q. 18. Were you related to Mr. Needham? A. No, sir.

"Q. 19. Well, now, Mr. McCoy, did you have any reason to believe, no strike that. Did you ask him whether or not it was a note? A. No, I never asked him anything. They just wanted me to sign that and in a few days—I don't know how long—he asked me what it was I signed, did I know, and I just said to him I hope it wasn't a bad check and he told me it was his will. Now, whether—

"Q. 20. Now, then, you say in a few days after that? A. Yes, I wouldn't say how long it was.

"Q. 21. Just what was it he said to you? A. Just asked me did I know what I signed and I said I have a pretty good idea because he said he was going to write a will, been talking about it, and he told me then it was.

"Q. 22. What is that you say about him talking to you about—you mean he talked to you before-hand? A. No, he said he was going to write him a will.

"Q. 23. I am not talking about when. Had you heard him talk about before that writing a will? A. Said he was going to have one wrote.

"Q. 24. Had you heard him talk about that on more than one occasion? A. I don't know, just to say how many times, whether more than once, just how many times. I wouldn't say.

"Q. 25. Was it near that time? A. Well, I guess it wasn't too long.

"Mr. Kinton: Object to that—a matter of guess work.

"Q. 26. In other words, you had heard him back shortly before that, or some time before that, talk about writing a will? A. He said he was going to have one wrote.

"Q. 27. From what he said, to you about it and from what happened on the street at the time you went up there, I will ask you whether or not you knew or thought you knew what it was you were signing?

"Mr. Kinton: I object to that as being a conclusion in his own mind, not signifying at the time that will was executed that it was his will—not what he conceived in his mind from some outside circumstances.

"Court: I believe that is right, Mr. Holmes.

"Mr. Holmes: On the basis of that Miller opinion—

"Court: (To jury) Gentlemen, let me get this question settled. I hate to keep asking you to go out but it is important. I will just have to ask you to step out a minute and let me get this question settled."
(Jury Retires)

After examination and discussion of some authorities, and especially the case of Lawrence v. Lawrence, there was a colloquy between the Court and Mr. Holmes which ended by Mr. Holmes' statement: "All I am asking him now is, from what happened, if he understood or thought he knew what he was signing."

"Court: What is your answer to that question?

"Mr. Holmes: What is your answer to that? A. I really thought that was what I was signing, but still,

just say knowing, I never did look at it enough, just signed it—to say knowing that was what it was, I wouldn't say I just knowed that was what it was."

After some further questioning by the Court, the following occurred:

"Mr. Landrum: If your Honor please, let me ask him two or three questions.

"Court: All right.

"Questions by Mr. Landrum:

"Q. 1. Mr. McCoy, now, do you or do you not recall that Mr. Needham said to Mr. Frazier, when he went in there to get you, the two come in there together, that he told Mr. Frazier he wanted you all to sign his will? A. I wouldn't say I heard it.

"Q. 2. Would you say you didn't hear it? A. Would I say I didn't hear it?

"Q. 3. He might have said that? A. He could have said it and me not heard it, just out on the street, he wanted me to sign a paper.

"Q. 4. If Mr. Frazier said he did that, he said that in your presence and in his presence, would you then say that you think he said it? A. I wouldn't have any doubt that he didn't say it. What I meant to say I just wouldn't say I knowed.

"Q. 5. You just say you don't recall what took place at that time, nor all the conversation? A. That is right.

"Court: When you signed, executed this paper, did you know you were signing as a witness to the will of Mr. Needham? A. Just to say I knowed, I wouldn't say I knowed it. I would say in a few days—I wouldn't say how many days—he asked me—

614

"Court: I am talking about the time you signed it?
A. I wouldn't say I knowed it was a will.

"Mr. Landrum: Would you say you didn't know it? A. I just signed a paper. I wouldn't say I knowed it was a will or I knowed it wasn't a will.

"Mr. Holmes: Would you say you thought you were signing his will at that time? A. I really thought that was what it was, but to say knowing it, I wouldn't say I personally knowed it was a will."

After reading in evidence the petition of William Cecil Doyle filed in the County Court, the proponents offered to read in evidence the paper writing purporting to be the last will and testament of W. H. Needham, a carbon copy of which had heretofore been read to the Court, but not to the jury. The defendant objected to the reading of said paper writing purporting to be the last will and testament of W. H. Needham in evidence before the jury, which objection was sustained by the Court, and to which action of the Court the plaintiffs excepted. Thereafter, a motion for a peremptory instruction in favor of the will was made by the proponents and overruled by the Court; and a motion for a peremptory instruction against the will was made by the defendant, which motion was granted by the Court.

After a motion for a new trial had been made and overruled, an appeal was perfected to this Court. The administrator c/t/a and Boyd Moore, as appellants, have filed eight assignments of error in this Court. Counsel for appellants have divided the eight assignments into five classifications, however, conceding that only five questions are presented. We will treat them in like manner.

■ Assignments of error, one and two, raise the question of whether the trial Court erred in refusing to

sustain a motion made to dismiss the pleas of the defendant, and as to whether the trial Court had jurisdiction to hear an issue of devisavit vel non on this record in this case. The questions raised by these two assignments are predicated on the theory of judicial estoppel, it being the contention of proponents of the will that the petition in the County Court, which was sworn to, did not question the validity of the will, except as to that part of it which disposed of personal property; and that being verified, the contestant could not be permitted to take an inconsistent position in the Circuit Court. The contention as to lack of jurisdiction of the Circuit Court to try the issue of devisavit vel non is predicated upon the theory that the petition, itself, conceded the validity of the will, except as to that part of same which disposed of personal property. Aside from the question of judicial estoppel, which we do not think is particularly applicable to the facts of the instant case, the position of appellants is that litigants, under the decisions of our courts, may not be permitted to take inconsistent positions. The authorities cited in appellants' brief do not fit the facts of the instant case, especially when we consider that the trial judge allowed an amendment which removed the apparent inconsistency, if any existed, and destroyed the claim that contestant was judicially estopped. The propriety of the trial court's allowing such amendment is covered by the second group of assignments of error which will be discussed in a latter part of this opinion. In any event, there is no substantial inconsistency in the position taken by contestant. He is the grandson and only heir at law of W. H. Needham, deceased. If the will be good, he would get the real estate devised by it; so it would make no difference to him, so far as the land is concerned, whether he inherit

same without a will, or take same under provisions of the will. By the same token, Boyd Moore would in neither situation, acquire any of the land. So far as the personal property is concerned, whether William Cecil Doyle obtains same by destroying the will in its entirety, or by merely showing a revocation of that part of same which bequeaths the personal property, the result to him would be the same. William Cecil Doyle made no representations on which the proponents of the will have acted to their detriment, and no case for equitable estoppel is made out.

■ Even if we assume, however, that the position taken by contestant, Doyle, in the Circuit Court, was different from or inconsistent with his position taken in the County Court, it was not too late for him to amend the pleadings so as to remove the inconsistency. Contestant's rights, in that situation, are controlled by the decision of our Supreme Court in the case of Carter v. Pickwick Greyhound Lines, 166 Tenn. 200, 60 S. W. (2d) 421. In that case, the cases of Stamper v. Venable, 117 Tenn. 557, 97 S. W. 812, and Stearns Coal & Lumber Co. v. Jamestown R. Co., 141 Tenn. 203, 208 S. W. 334, relied on by appellants in the instant case, are discussed and disposed of adversely to the contentions of appellants here,—as are the cases of Heggie v. Hayes, 141 Tenn. 219, 208 S. W. 605, 3 A. L. R. 150, and Johnston v. Cincinnati, N. O. & T. P. R. Co., 146 Tenn. 135, 161, 240 S. W. 429. In the Carter case, Mr. Justice McKinney, speaking for the Supreme Court, said [166 Tenn. 200, 60 S. W. (2d) 422]:

"The question for decision is, Should the plaintiff be precluded from recovering under the doctrine of 'shifting positions,' or 'positive procedure?' This rule is based upon the following statement by Mr.

Bigelow in his work on Estoppel (5th Ed.) p. 717, which has been approved by this court in a number of cases, and which is as follows: 'If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed. The coercive powers of the law, available only between those who consented to its exercise, could be set at naught by all. But the rights of all men are in the keeping of the courts, and consistency of proceeding is therefore required of all those who come in or are brought before them. It may accordingly be laid down as a broad proposition that one, without mistake induced by the opposite party, who has taken a particular position deliberately, in the course of litigation, must act consistently with it. One cannot play fast and loose.'

"It will be obseved that the rule applies to inconsistent positions in the trial, and our decisions so limit it. It does not prohibit a party from amending his pleading so as to set up the true facts, when by inadvertence or mistake he has stated the facts incorrectly. Such is a common, everyday practice, and, when made in good faith, such an amendment, in the sound discretion of the trial court, will be allowed. In this particular case plaintiff was not taking inconsistent positions *in the trial,* but was contending only that his testator did not die from the injuries received when his buggy was struck by the bus of defendant.

"In Stamper v. Venable, 117 Tenn. 557, 97 S. W. 812, it was held that a litigant who had contended in the chancery court and in the Court of Chancery Appeals that certain documents were deeds could

not in the Supreme Court shift his position and claim that they were wills.

"In Stearns Coal & Lumber Co. v. Jamestown R. Co., 141 Tenn. 203, 208 S. W. 334, it appears that complainant charged that defendant was not a corporation, while in another pending suit it had charged that it was a corporation. The court treated the two suits as one, as did the complainant, and applied the doctrine here invoked. Complainant, in the same suit, was contending inconsistently that defendant was and was not a corporation.

"At this point it is well to note the distinction between 'estoppel' and 'positive procedure.' In 10 Ruling Case Law 698, it is said: 'The rule that a party will not be allowed to maintain inconsistent positions in judicial proceedings is not strictly one of estoppel, partaking rather of positive rules of procedure based on manifest justice and, to a greater or less degree, on considerations of the orderliness, regularity, and expedition of litigation. Certainly the elements of reliance and injury do not enter into such so-called estoppel to the same extent that they do in equitable estoppel proper.'

"In Heggie v. Hayes, 141 Tenn. 219, 208 S. W. 605, 3 A. L. R. 150, it was held that in a seduction case, where defendant's counsel, in argument before the jury, conceded that the plaintiff bore a good reputation, and the case was tried on that theory, he could not, on motion for a new trial, introduce evidence tending to besmirch her character.

"In Johnston v. Cincinnati, N. O. & T. P. R. Co., 146 Tenn. 135, 161, 240 S. W. 429, 436, the complainant had testified both ways in the same case as

to a material fact. In applying the 'positive procedure' rule, the court said:

" 'We wish to add that we have searched complainant's testimony for an explanation of its inconsistencies that would entitle it, upon grounds of inadvertence or mistake, to some weight on the side of the jury's verdict upon these two issues, but could find none, and that, when for this purpose we went outside of his testimony and looked to his conduct and correspondence before the present difference arose, the impossibility of any such explanation was only emphasized.'

\* \* \* \* \* \*

"In Sartain v. Dixie Coal & Iron Co., 150 Tenn. 633, 655, 266 S. W. 313, 319, the defendant had filed a sworn answer in which it was alleged that a part of the coal involved came from the land of complainant, while by an amendment it was averred that none of this coal came from this particular land. It was contended that defendant was estopped to take a position which was inconsistent with its sworn answer. In responding to this contention, the court said:

" 'The question now presented is not one of judicial estoppel, but whether the chancellor abused his discretion in allowing an amendment to a sworn pleading. In the case of Hill v. Harriman, supra (95 Tenn. 300, 32 S. W. 202), as will be observed, the chancellor had disallowed the proposed amendment.

" 'It is undoubtedly true that the liberal rules which apply to amendments of unsworn pleadings do not prevail where the pleading is under oath. But the amendment in this case was apparently made

without objection. Certainly none appears in the record. There is no wayside bill of exceptions; nor is there a recital in the decree. Even the petition to rehear is silent on this subject. So far as the record shows, the point was raised for the first time on appeal.

" 'We do not mean to say that exceptions must be taken to every ruling and interlocutory decree made by the chancellor during the progress of an equity suit, in order to permit an assignment of error in the appellate courts. There is a clear distinction between courts of law and courts of equity in this regard.

" 'Nor do we intend to depart from the sound doctrine that sworn pleadings cannot be amended without explanation, and as a matter of course.

" 'We simply hold that on this record, and under the facts disclosed, we cannot say that the chancellor abused his discretion in allowing the amendment.'

"Likewise, in the instant case, the question involved is that of abuse of discretion in allowing the amendment, and, after fully considering the case, we have concluded that there was no such abuse." Carter v. Pickwick Greyhound Lines, 166 Tenn. 200, 203-208, 60 S. W. (2d) 421.

As to the jurisdiction of the Circuit Court to try this cause on an issue of devisavit vel non, we think the authorities are clear that it did have such jurisdiction. This phase of the case is, we think, controlled by the decision of our Supreme Court in Keith v. Raglan, 41 Tenn. 474. In that case the petition to have a will re-probated in solemn form was filed in the County Court, and the cause certified to the Circuit Court. In the Circuit Court a motion was made to dismiss the cause and strike it from the docket because the petition before the County

Court had not been sworn to. In disposing of this question in the Supreme Court, Caruthers, J., speaking for that Court, said:

"But in this case the party was too late in making the objection. This should have been done in the County Court when appearance was made in obedience to the summons or citation. Instead of that, a motion was made to dismiss the petition upon another and insufficient ground, and on failure of which an answer was filed, and this objection made for the first time in the Circuit Court. That court did right then to overrule the motion, and ordering an issue devisavit vel non to be made up. And the appeal from that ruling must fail here." Keith v. Raglan, 41 Tenn. 474, 478.

The second group of assignments of error, as classified by appellants' counsel, being assignments of error, three and four, raises the question of the correctness of the trial judge's ruling in permitting an amendment to the petition filed in the County Court, and contends that such amendment took proponents of the will by surprise and prejudiced them by reversing the burden of proof.

We think the trial judge was entirely correct in permitting an amendment in the Circuit Court to the petition filed in the County Court. Contestants took the position that they should have the cause remanded to the County Court, where such amendment to the petition could be made. The trial judge ruled that such procedure would be an unnecessary and useless procedure, as such amendment if necessary, could be made in the Circuit Court, which was done, although done over the objection of proponents of the will. Perhaps the only real necessity for the amendment being made at all, was to remove the contention of the proponents that contestant

was judicially estopped by the sworn petition filed in the County Court. But for that, he might have treated the County Court petition as *functus officio,* the case having already been removed to the Circuit Court by virtue of same, and directed that whatever pleadings were appropriate, be made up in the Circuit Court. The trial judge's ruling cannot be said to have taken proponents by surprise, or prejudiced them in any manner. The trial judge offered to give them a continuance if they considered the amendment as raising any issue which they were not prepared at that time to meet, whereupon, they declined a continuance. In that situation, they certainly cannot be permitted now, and in this Court for the first time, to say that they were taken by surprise.

So far as the burden of proof is concerned, the amendment allowed by the trial judge did not in any way alter or affect that to the prejudice of proponents.

■ The law on this subject is set out in Pritchard on Wills and Estates (3rd ed.) Sec. 368, as follows:

"The subject of the burden of proof on the trial of issues devisavit vel non has been fully considered in preceding articles. It has been shown that the general burden is upon the proponent to establish that the paper propounded as a will was the voluntary act of a capable testator, and that the formalities required by law were complied with in its execution; that, unless the testator was illiterate, or there are circumstances of suspicion surrounding the case, it is not necessary for the proponents to prove the testator's capacity or that he had knowledge of the contents of the will, for these would be presumed from the fact of due execution; but that in cases of doubtful capacity, illiteracy, blindness and the like, and in cases with suspicious surroundings, the burden is upon the

proponent to satisfy the minds of the jury that the testator was not imposed upon and that he had knowledge of the contents of the instrument and executed it freely and understandingly, with testamentary intent. It is deemed sufficient, in addition to this general recapitulation, to refer the reader to preceding sections discussing these questions.''

The third group covered by the fifth and sixth assignments of error questions the action of the trial court in permitting the defendant to contest the due execution of the will, and in requiring the plaintiff in error to assume the burden of proof and prove the due execution of the will. If these questions were not already properly before the trial court on the record certified from the County Court, certainly they were properly before him and the jury after the amendment to the petition in the County Court had been allowed. The correctness of the trial judge's ruling in this matter has been discussed in disposing of assignments of error, three and four. Brief of appellant concedes that the same argument and same authorities apply on these two assignments of error. We agree with them, to that extent, and no further discussion is, therefore, necessary.

The seventh and eighth assignments of error are mutually exclusive, each of the other. The seventh assignment of error questions the correctness of the trial judge in refusing to grant a motion for a directed verdict in favor of the will. The eighth assignment of error questions the correctness of the trial judge in granting a motion for a directed verdict against the will.

We cannot say that the trial judge erred, on the evidence preserved in the record before us, in refusing to grant a peremptory instruction in favor of the will. What we will say on this subject, with reference to the correct-

ness of his having granted a peremptory instruction against the will, will be equally applicable to the seventh assignment of error, except that same will be in reverse.

With reference to the correctness of the trial judge's having granted a motion for a directed verdict against the will, which question is presented by the eighth assignment of error, it is evident from the record before us that he felt that the situation was controlled by the decision of the Court of Appeals in the case of Lawrence v. Lawrence, 35 Tenn. App. 648, 250 S. W. (2d) 781,—the opinion in that case having been written by Hickerson, J. The record discloses that after the trial judge had granted the motion for a directed verdict against the will, he said to the jury:

"Gentlemen, the statute requires that a testator shall signify to the attesting witnesses that the instrument is his will, and the Court of Appeals in the case of Lawrence v. Lawrence reverses an opinion written by Judge Roy Hickerson and states that this statute is clear, plain and unambiguous; surely it cannot be contended that this provision of the statute is doubtful in meaning. It simply means that the testator must state to the witnesses, in substance, that the paper writing is his will and that he wants them to sign it as witnesses.

"The last gentlemen, Mr. McCoy, who testified stated that the testator came to him one day on the streets of Milan and told him he wanted him to sign a paper and that he went to Mr. Henry Webb's office with him, in the presence of Mr. Frazier and that all three signed this paper, and that at no time in Mr. Webb's office was anything mentioned about a will and he did not know it was a will he signed; however, he thought he was signing it, and at no time

did Mr. Needham ask him to sign his will, sign it as a witness, and did not signify that it was a will, and some days later Mr. Needham came to him and asked him if he knew what it was he signed, and he told him that it was his will.

"Now, another case has been called to my attention, the case of Miller v. Thrasher [36 Tenn. App. 88, 251 S. W. 2d 44], which holds that a testator can signify by other means, attendant circumstances, the fact that he does want the witness to witness his will. In that case he sent word by a third party to those witnesses and told them through this third party he wanted them to sign his will, and when they were there the will was read over to the testator, and then it was executed and they signed as witnesses.

"Our case has no attendant circumstances that strong by which it could be signified to this man that actually he was witnessing a will. Therefore, under the authority of Lawrence v. Lawrence I must direct that you gentlemen return a verdict against the will."

In the case of Lawrence v. Lawrence, 35 Tenn. App. 648, 250 S. W. (2d) 781, 784, which is obviously the case referred to by the trial judge, the Court of Appeals in the opinion written by Hickerson, J., held that, as a matter of law, the formal requisites for a valid will had not been established. In this case, one of the subscribing witnesses was dead and, of course, could not testify, although his signature was proved. The surviving subscribing witness did testify, but testified both ways. In part of his testimony he said that the testatrix did state that the document which she signed was her will, and requested him and the other subscribing witness to sign same as such; and in another part of his testimony, he said that she did not tell them that it was her will, and

that they did not know it was her will; or, at least, that was the construction of same insisted on by proponent of the will. In disposing of this contention, Hickerson, J., speaking for the Court of Appeals, said:

"Proponent contends the subscribing witness testified she was told that the instrument was her will by testatrix before witness signed it; and that witness, also, testified to the contrary. Her evidence is not susceptible of this construction. Taken as a whole, it shows she did not know this was the will of testatrix when the witness signed it.

"But if we should assume that witness affirmed and denied that testatrix told her that the instrument was her will before witness signed it, such testimony would have no probative value. In Johnston v. Cincinnati, N. O. & T. P. R. Co., 146 Tenn. 135, 158, 240 S. W. 429, 436, the court said:

" 'The question here is not one of the credibility of a witness or of the weight of evidence; but it is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies; but if the proof of a fact lies wholly with one witness, and he both affirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no stronger than his testimony to disprove it, and it would be mere caprice in a jury upon such evidence to decide it either way.'

"There is no proof that this paper writing which the proponent proposed for probate was executed in conformity with the laws of this state regulating the execution of wills. Code Section 8098.4."

The will in the Lawrence case contained no attestation clause.

In the case of Miller v. Thrasher, 36 Tenn. App. 88, 251 S. W. (2d) 446, 449, the opinion of the Court of Appeals, written by Howard, J., discloses that there was an attestation clause of the will, which was in the form of an affidavit, sworn to by the witnesses before a Notary Public named Morgan. In this case, the verdict of the jury and the judgment of the lower court had upheld the validity of the will,—refuting, thereby, an attack against same, both on the ground of lack of mental capacity of the testator and that the will was not witnessed, attested and executed as required by law.

In disposing of this latter question in the Court of Appeals, the opinion of Howard, J., says:

"Next it is insisted that the proof does not show that the attesting witnesses signed the will in the presence of each other and in the presence of the testator as required by Subsec. (2) of the foregoing Code Section.

"In support of this assignment the contestants rely solely upon the testimony of L. L. Jones, one of the attesting witnesses who stated that he was present with Miller and Varner, the other attesting witnesses, when the will was read by Morgan, and that he signed the will in their presence but that he did not 'believe' that he saw either Miller or Varner actually sign their names. It is possible that this witness did not remember all the details of the transaction because of the lapse of time, as Morgan testified that he not only read the will in the presence of Miller, Jones and Varner, but that it was signed by each of them in his presence and in the presence of each other. Varner also stated that he was present when the will

was read by Morgan, and that all the parties signed their names to the will in the presence of each other.

"Under the foregoing proof we think there was ample evidence to support the jury's finding that the will was signed by Miller and the attesting witnesses in the presence of each other. In this State evidence of due execution of a will is not confined to the attesting witnesses but may be proved by other competent evidence including the testimony of persons who were not subscribing witnesses but were present at the execution of the will. Rose v. Allen, 41 Tenn. 23; Frear v. Williams, 66 Tenn. 550; Key v. Holloway, 66 Tenn. 575; Sizer's Pritchard on Wills, Secs. 334, 335, p. 379; 57 Am. Jur. Secs. 905, 906, pp. 596, 597."

In the instant case, as in the case of Miller v. Thrasher, there was an attestation clause to the will, which we think should make a substantial difference, raising, at least, a presumption that the recitals therein contained are true.

In the instant case, subscribing witness, S. L. Frazier, testified that the testator, W. H. Needham, and the other subscribing witness, Ralleigh McCoy, were together when the testator found him (Frazier) in the bank, and requested that he go with testator and the other attesting witness, McCoy, to witness his will. Taking the testimony of McCoy most strongly against the validity of the will, as did the trial judge, nevertheless, we think the jury could properly have found in favor of its validity, if it believed the testimony of Frazier. In that situation, we feel that the learned trial judge was clearly in error when he granted a motion for a peremptory instruction against the validity of the will.

In the very recent case of Leathers v. Binkley, 196 Tenn. 80, 264 S. W. (2d) 561, 562, the Supreme Court in an opinion written by Mr. Justice Gailor reversed both the Court of Appeals and the judgment of a trial court holding that a will was not valid because, in the execution of said paper, the provisions of Chapter 125 of the Public Acts of 1941, Code Section 8098.4, had not been complied with, in that (1) Mrs. Merryman did not sign the paper in the presence of the witnesses, (2) did not declare to both of said witnesses in the presence of each other that said paper writing was her last will and testament, and (3) the witnesses thereto did not sign in the presence of each other. After said petition was filed, answers were filed by the defendants named, who denied the material averments of the petition, and on the pleadings so made up with the original paper writing, which had been probated as the last will, the case was certified to the Circuit Court, and there tried on the issue of devisavit vel non before a jury.

In this case, there was no attestation clause except that the witnesses swore to and subscribed same before a Notary Public. The testimony of one of the attesting witnesses was somewhat indefinite as to whether the attesting witness had been asked by the testatrix to witness the will, but in the course of his testimony, he was asked and answered the following questions:

"'Q. Was this will executed or signed by Mrs. Rosa Reynolds Merryman, in your presence and in the presence of Jean Gilmer [the other attesting witness], and signed by you and Jean Gilmer in the presence of Mrs. Merryman? A. Yes.'"

The other witness to the will, Mrs. Jean Gilmer, was asked and answered the following questions:

"'Q. * * * Now I hand you what purports to be—

what purports to be Mrs. Rosa Merryman's will—
and ask you if your name appears on that will as a
witness? A. Yes.

" 'Q. Who wrote your name on that will, did you
write that? A. I did.

" 'Q. Now way did you write it on there? A. I
am sure they asked me to.

" 'Q. Did you know Mrs. Rosa Merryman? A.
Yes.

" 'Q. Had she been in the office on more than one
occasion? A. Yes.

" 'Q. So then you did know her? A. Yes.

" 'Q. How far, at that time, were you away from
Mrs. Merryman, what distance apart were you,
would you say the desks were apart,—were you were
you as close as I am to you now? A. About.

" 'Q. About like that. Now in speaking of the
hearing condition of the office, standing by his table,
could you hear them talking? A. Yes, sir.' ''

After quoting the above testimony, the opinion of Mr
Justice Gailor said:

"The testimony of the Notary Public was entirely
negative, since he remembered nothing about the
occurrence except that he identified his own signa-
ture and seal, and testified them to be genuine.

"While it is true that neither Mr. Morrison nor
Mrs. Gilmer remembered every detail of the signa-
ture and attestation of the will, the important fact in
the record is that there was neither from Morrison,
Mrs. Gilmer, nor the Notary Public, a line of positive
affirmative testimony that would support the allega-
tions of the petition of contest, nor the verdict of the
jury, that the will had not been regularly and legally

executed in strict accordance with the requirements of Code, sec. 8098.4.''

After quoting from Sizer's Pritchard on Wills, Sec. 336, p. 380, and Page on Wills, Vol. 2, Sec. 755, p. 462, and referring to some decisions of other jurisdictions, Mr. Justice Gailor continued:

''To protect the right of testamentary disposition of property, we must sustain a will as legally executed if it is possible to do so, Sizer's Pritchard on Wills, Secs. 384, 386, et seq.; 57 Am. Jur., Wills, sec. 218. Compare: Ball v. Miller, 31 Tenn. App. 271, 214 S. W. (2d) 446.

\* \* \* \* \* \*

''By the fourth assignment of error made to support the petition for certiorari, it is insisted that there was no material evidence to support the verdict of the jury. This assignment of error is valid and must be sustained.'' Leathers v. Binkley, 196 Tenn. 80, 82, 83, 85, 264 S. W. (2d) 561.

The facts of the instant case are not as strong as those involved in the case of Leathers v. Binkley, and therefore, do not warrant, in the opinion of this Court, a ruling such as was made in that case, that, as a matter of law, the will in the instant case should have been held valid. We have already ruled, in disposing of assignment of error, number 7, that the trial judge did not err in refusing to grant a motion for a directed verdict in favor of the will; but we are of opinion that the facts of the instant case, on the authority of Leathers v. Binkley and Miller v. Thrasher, should, at least have been submitted to the jury for determination as to whether or not the will had been validly executed. Assignment of error, number eight, is therefore sustained, and the cause is remanded to the Circuit Court of Gibson County for a new

trial consistent with this opinion. The costs of the appeal are adjudged against appellee, William Cecil Doyle, and his surety on the bond filed in the Circuit Court of Gibson County. The costs of the lower court will await the final outcome of the cause in that court.

Avery, P. J. (W.S.), and Carney, J., concur.