MRS. MARY JOSEPHINE MATILDA IFFLAND
SMITH CURRY et al., Plaintiffs-in-Error, v. FOSTER
BRIDGES et al., Defendants-in-Error. —325 S. W. (2d)
87.

Western Section. January 28, 1959.

Certiorari denied by Supreme Court June 5, 1959.

Hughie Ragan, George L. Morrison, Jackson, for plaintiffs in error.

William P. Moss, Homer Waldrop, Melvin L. Rowland, Walter J. Key, Jackson, for defendants in error.

AVERY, P. J., (Western Section). This case comes to this Court from a judgment of the Circuit Court of Madison County, Tennessee, on an issue of devisavit vel non respecting the will of John S. Eppinger, deceased, whose age at the time of his death was approximately 58 years. The will was executed on May 29, 1957, and the testator committed suicide on or about July 16, 1957, the manner of which will be hereinafter referred to. He was a bachelor and left an estate valued at approximately $200,000, consisting of both real and personal property, all of which was left in trust to certain trustees awaiting contingencies set forth in the will for the termination of the trust and the vesting of the residuary estate, the corpus of which will upon the termination of the trust vest in and be turned over to the Trustees of Union

University, Inc., an educational institution located in Jackson, Tennessee, for its use and benefit under the direction of its said trustees.

The will was prepared by lawyers of the law firm designated "Pigford & Key", the three members thereof being W. N. Key, Walter J. Key, and Melvin L. Rowland. The First National Bank of Jackson, Tennessee, W. N. Key, Walter J. Key, and Melvin L. Rowland were designated as joint executors. After the death of the testator and on or about the 23rd day of July, 1957, the executors presented said will to the County Court of Madison County, Tennessee, the Honorable August Wilde, Judge, for probate and it was there probated in common form, the Decree of Probation being set out on page 2 of Volume 1 of the transcript and record in this case, which consists of five volumes, together with many exhibits.

When the will was presented for probate and admitted to probate in common form by said county court, the subscribing witnesses, Mary Ryan and Corinne C. Hudson, both testified relative to the execution of said will as shown by said decree, and the Judge of said county court, following the direction of the will, appointed said First National Bank of Jackson, Tennessee, W. N. Key, Walter J. Key and Melvin L. Rowland as executors. Said will also designated the said bank and said individuals as trustees of said will, and directed the executors to perform the same duties in the administration of said estate in the same way and manner as said trustees were directed to do when the administration of said estate was closed and the trust executed by said trustees. Therefore, the said county court named said bank and said individuals as trustees as well as executors, requiring a

bond of $50,000 which was executed, and said executors and trustees properly qualified as provided by law.

On or about the 28th day of August, 1957, following the probate of said will, a contest was instituted by Mrs. Mary Josephine Matilda Iffland Smith Curry, who in her contest petition is said to be—

"a daughter of a sister of John S. Eppinger's grandmother and is the nearest relative on John S. Eppinger's father's side of the family."

Therefore, she is a cousin in the second degree of the testator.

The petition alleges that the instrument so admitted to probate in common form is not the will of John S. Eppinger, deceased, because testator was—

"of unsound mind at the time said paper was executed and incompetent to make a valid will, and, moreover, was unduly influenced to make the same by the said Foster Bridges, Willie Bridges, Mary Ann Bridges and Mrs. Charles Schmuck and perhaps others named as defendants above, who are legatees and devisees thereunder."

Among the parties made defendants were all the named devisees and legatees designated in said will, together with the executors and trustees named therein and hereinbefore set out.

Contestant executed a statutory bond as required by law and thereafter, on or about the 28th day of September, 1957, Union University, as the residuary legatee designated in said will, filed a sworn answer, denying the averments in said petition alleging mental incapacity

of testator, and undue influence upon him as averred in the petition, and on the 30th day of September, 1957 the executors, as hereinbefore set out, as such, filed their joint sworn answer denying the material allegations of the petition, and Union University executed the statutory bond required by law in said proceeding, whereupon a hearing was had before said County Judge relative to the relationship of the petitioning contestant to the testator, and it was there adjudged that she was related to the testator as the nearest of kin on his father's side of the family, and ordered the clerk of said court to make a transcript of the proceedings in that court, and together with the original will, certify same to the circuit court of Madison County for hearing there as provided by law.

The named Executors then filed their declaration averring that the paper writing so certified constituted the last will and testament of John S. Eppinger. Contestant filed a plea to the declaration that it was not the last will an testament of John S. Eppinger, deceased, and demanded a jury to try the case. Thereafter, Elizabeth L. Elliott, a minor nine years of age, acting by and through her next friend, Mrs. Frances Martin, filed a petition setting forth her relationship to the deceased testator requesting to be and was named a contestant. Her petition showed her to be a cousin of testator in the third degree.

On December 12, 1957, the trial of the case was begun to a jury and the court, Honorable Mark A. Walker, Judge, and after about five days, the evidence having been concluded, the plaintiffs, hereinafter referred to as proponents, moved the court for a directed verdict sustaining the will, upon the grounds that no competent,

relevant and sufficient evidence had been introduced whereby the jury could find against the will or in favor of the defendants, who are hereinafter referred to as contestants. Contestants moved the court for a verdict against the will and in their favor. These motions will be referred to more specifically hereinafter. These motions were overruled and after the arguments of counsel for all parties were concluded, the court proceeded to deliver his charge to the jury, and the jury failing to agree was discharged; whereupon, the proponents, as well as certain of the named legatees and devisees, who were plaintiffs, moved the court to grant a new trial, assigning as their reason therefor the following:

"The Court erred in overruling and disallowing the Plaintiffs' motion for a directed verdict in their favor, which was made at the close of all the evidence introduced upon the trial of the cause, upon the ground and for the reason that there was no evidence before the Court and Jury upon which a verdict in favor of the Defendants could be based."

They also prayed that the court direct a verdict in their favor and dismiss the suit. That motion was sustained by the court, the order of mistrial set aside, new trial granted as prayed, and a verdict directed in favor of the proponents. The court entered proper judgment sustaining the paper writing as the last will and testament of John S. Eppinger, deceased, taxed the costs against the original contestant, Mary Josephine Matilda Iffland Smith Curry, and her sureties on the cost bond, accruing to the ——— day of December, 1957, (which was the date on which the sureties sought and were by order of the court released as such, and contestant Curry

filed her oath in pauperis), and all the costs accruing thereafter against the said Curry, and directed the clerk to certify a copy of the judgment of the court, together with the original will, to the county court of Madison County, to be there recorded as required by law, to which action of the court the contestants saved their exceptions, were allowed 30 days in which to file motion for new trial, which they did and which was overruled by the court, exceptions to that action saved, and appeal prayed, granted and perfected to this court, where contestants have assigned errors.

It should be stated here that when the case was called for trial in the circuit court, the contestants moved that the rule be applied to all the witnesses with the exception of the executors, whereupon the proponents, together with the devisees and legatees in said will, Foster Bridges, Clara L. Jackel, Mrs. Charles Schmuck, and Union University, Inc. moved the court that they be made parties plaintiff to the declaration, which the proponents had filed. This was excepted to by the contestants on the theory that they were not parties to the suit five days before the case was called for trial, and made no bond. The court allowed the motion making the said parties joint proponents with the executors. Thereupon, the contestants moved the court for a continuance on the theory that they were not prepared to try the case with these new parties in it, but assigned no reason therefore, and the court overruled the motion for continuance and the case went to trial.

The will in question is of considerable length, consisting of fourteen (14) pages, each page being signed by the testator, and it serves no good purpose to set forth

that lengthy will in this opinion. The will is also signed at the end with the signature of the testator and is witnessed by Mary Ryan and Corinne C. Hudson. The last paragraph with the signature of testator, and the attestation clause with the signatures of subscribing witnesses, are as follows:

"In Witness Whereof, I, the said John S. Eppinger, at Jackson, Tennessee, herewith set my hand to this my last will and testament, typewritten on fourteen (14) sheets of paper (including the attestation clause and signatures of witnesses) upon the margin of each one of which I have also written my name, this 29th day of May, nineteen hundred and fifty-seven.

"(signed) John S. Eppinger

"The foregoing instrument was, on the date thereof, signed, sealed, published and declared by the Testator, John S. Eppinger, as and for his last will and testament, in the presence of us, who at his request, in his presence and in the presence of each other, have affixed our signatures as witnesses thereto.

(signed) Mary Ryan 420 E. Chester St.

"Corrine C. Hudson 108 Melrose St."

It should be further stated that the record shows the death of Mary Ryan to have occurred after the will had been probated in common form in the county court and prior to the hearing of this case in the circuit court of Madison County.

It should be also stated that when the court delivered his charge to the jury, he instructed the jury that the formal execution of the will had been proven by the proponents, and he did not submit the question of whether it had been formally executed to the jury. On the question of the execution of the will, he charged the jury as follows:

"The court is of the opinion and so instructs the jury, that the plaintiff, the executors, have complied with the law insofar as the formal execution of the paper writing is concerned, and it would be your duty to find in favor of the will unless you find from the preponderance of the evidence, that the deceased, John S. Eppinger, at the time he executed said paper writing did not have mental capacity sufficient to make a will or that he was unduly influenced to execute the same, as hereinafter explained."

Thus it will be seen that the trial court at that stage of the proceedings had determined that there were no facts proven to justify him in submitting to the jury the question of whether the will had been formally executed as provided by law. By his charge he included only the issues of mental capacity and undue influence.

The errors assigned are numbered with Roman numerals from I to VIII inclusive.

Assignment V is to the effect that the court erred in refusing to grant contestants' motion for a continuance.

Assignment VI is to the effect that the court erred in permitting Union University, Foster Bridges, Clara Jaekel and Mrs. Charles Schmuck to be made parties proponents with the executors and trustees.

Assignment VIII is to the effect that the court erred in assessing costs against Mary Smith Curry.

■ These three referred to Assignments all constitute matters that are in the discretion of the trial court and there appears to be no abuse of that discretion, and they will be overruled without further comment.

■ Assignments I, II, III, IV, and VII, taken together, pose three questions for decision by this court as follows:

(1) Is there any substantial material evidence that the will of John S. Eppinger was not executed as provided by law?

(2) Is there any substantial material evidence that the testator did not possess mental capacity sufficient to execute a valid will?

(3) Is there any substantial material evidence that John S. Eppinger's will was the result of undue influence?

We will dispose of these posed questions in the order hereinabove set forth, and in so doing will keep in mind the following legal rules which must govern our determinations and conclusions:

(1) Although a case such as this is usually referred to as a will contest, yet on an issue of devisavit vel non in the circuit court is in substance an original proceeding to probate a will. Jones v. Witherspoon, 182 Tenn. 498, 187 S. W. (2d) 788; Cude v. Culberson, 30 Tenn. App. 628, 637, 209 S. W. (2d) 506; Jones v. Sands, 41 Tenn. App. 1, 292 S. W. (2d) 492; Phillips Pritchard on Wills, Vol. 1, sec. 368.

(2) Authority to direct a verdict in a will contest is the same as in other cases within the purview of constitutional guaranty of trial by jury, and where the question of the court's right to direct a verdict is involved, if there is a dispute as to any material evidence which is substantial in its nature, or any legal doubt as to the conclusions to be drawn from the whole evidence upon any of the issues involved, a verdict cannot be directed. Jones v. Sands, supra; Cude v. Culberson, supra; Needham v. Doyle, 39 Tenn. App. 597, 286 S. W. (2d) 601; Lawrence v. Lawrence, 35 Tenn. App. 648, 250 S. W. (2d) 781.

(3) The evidence to warrant a trial court in submitting the issues in a case to the jury must rest upon that evidence which is substantial and material and not upon a scintilla or glimmer of evidence. Hammond v. Union Planters Nat. Bank, 189 Tenn. 93, 222 S. W. (2d) 377; Cude v. Culberson, supra; Jones v. Sands, supra; Knoxville Traction Co. v. Brown, 115 Tenn. 323, 331, 89 S. W. 319.

(4) On an issue of mental incapacity, the opinion of each witness as to such incapacity must stand upon the facts detailed by that witness, and where several witnesses are used to detail different actions of a testator as a basis for expressing an opinion of the incapacity of such testator to execute a valid will, such circumstances could not be lumped together in order to test the validity of the separate opinions so expressed. Cude v. Culberson, supra, 30 Tenn. App. at page 646, 209 S. W. (2d) at page 514; Fitch v. American Trust Co., 4 Tenn. App. 87, 94.

(5) The burden of proof upon trial of issue devisavit vel non is upon the proponent to establish that the propounded instrument is the result of the voluntary act of a capable testator, and that the formalities required by law were complied with in its execution. If it be found that the testator was illiterate or that there are suspicious surrounding circumstances based upon reasonable and substantial testimony from which a jury might reasonably infer the incapacity of the tesator or the exercise of undue influence when such issues are raised, it is not necessary for the proponent to prove the testator's capacity or that he had knowledge of the contents of the will, for his capacity and voluntary act in its execution would be presumed from the proof of due execution. Cude v. Culberson, supra; Jones v. Sands, supra; Needham v. Doyle, supra; Phillips Pritchard on Wills, Vol. 1, sec. 368, p. 340.

(6) It is not essential or required that a testator personally make an express request to the attesting witnesses that they act as such. He is required to signify to them that the instrument is his will and both such request and his declaration that the instrument is his will, may be implied from his acts, conduct and attending circumstances. Miller v. Thrasher, 36 Tenn. App. 88, 92, 93, 251 S. W. (2d) 446; Needham v. Doyle, supra; Page on Wills, Vol. 1, sec. 365, pp. 661, 662; Am. Jur. Vol. 57, sec. 289, p. 223; Phillips Pritchard on Wills, Vol. 1, secs. 222, 223.

As to the first question, that is, the execution of the propounded instrument as the will of the testator, it

is admitted that he, himself, signed it as required by law. Therefore, in accord with the due and legal execution of a witnessed will, as provided by T. C. A. Sec. 32-104, it was necessary for the proponents to prove:

(1) That Eppinger signified to the attesting witness that the instrument was his will;

(2) That he signed it in the presence of the two attesting witnesses;

(3) That the attesting witnesses signed it (a) in the presence of the Testator and (b) in the presence of each other.

In the second paragraph of the statement of the case and in the brief of counsel for contestants, which are plaintiffs-in-error here, he says:

"The will was contested on the grounds of improper execution, undue influence used on the testator and that the testator did not possess sufficient mental capacity."

The subscribing witness, Corinne C. Hudson, who is the same person as Mrs. W. R. Hudson, the record shows to be a person of considerable intelligence and legal knowledge; had done secretarial work for a reputable lawyer, Mr. Donald Weaver, for more than three years and was familiar with the method and manner in which wills were signed and witnessed. She testified that Walter Key came into the office where she and Mary Ryan, the other attesting witness, were and at his suggestion they went with him into the office space where Mr. Rowland and Mr. Eppinger were; that she was introduced to Mr. Eppinger whom she had not known before, and she was asked and answered:

"Q. At the time you went to the office, you and Miss Mary Ryan with Walter Key that if Mr. Eppinger made known to you there that he had his will before him and desired you to witness it? A. Yes, he asked us to witness the will."

She then described the physique and physical appearance of the testator, stating that in her estimation he was over 21 years of age, and she was asked and answered:

"Q. At that time at Mr. Eppinger's request I'll ask you to state whether or not you did witness his will? A. Yes, sir, I witnessed his will."

She was then handed a paper, instructed that it contained 14 pages, asked to look at it and state whose signatures were upon it, and she answered:

"A. Well my signature and Mary's signature and Mr. Eppinger's signature, of course.

"Q. Did you see Mr. Eppinger, Mr. John S. Eppinger, whose signature appears or whose name appears upon this instrument, did you see him place that signature upon this particular instrument? A. Yes, sir, I saw it.

"Q. At that time, were you in his presence? A. Yes, sir, within 2 feet of him.

"Q. State whether or not Miss Mary Ryan was likewise present and in a position to see and did she see the signature of Mr. Eppinger? A. She was present and in position to see. She saw it too.

"Q. And were you and Miss Mary present with each other at that time along with Mr. Eppinger? A. Yes sir we were together."

She thereafter stated that she was in the room not more than 10 or 15 minutes, and that the original and a copy of the will were both signed by Mr. Eppinger in her presence and the presence of Mary Ryan, and that both she and Miss Ryan signed the original and the copy. Both the original and the copy of the will are made exhibits in this case and appear in the record. She stated that she saw Mr. Eppinger sign the copy and that it was signed by her and Miss Ryan in his presence and in the presence of each other. She further stated that Miss Ryan had died since the will was executed.

On cross-examination, she was asked many questions about whether she read the whole will or not, and said that what she did really notice was the last page and that when she went into the room with Miss Ryan and Walter Key, and after Mr. Key had introduced them to Mr. Eppinger, Walter Key said: "these are the ones to witness your will"; "Do you want them to witness your will?" He said, "I do". Her answers to some questions on cross examination are as follows:

"A. I didn't look at anything but the last page and saw him sign it and then we witnessed it and I didn't consider it any of my business as to what was in the will or anything."

Again:

"A. Well all of it looked like a will but I didn't read it naturally."

Again:

"A. Well I didn't examine any of it. I just saw the man sign the will and I witnessed it."

Again:

"A. Yes, I saw the man sign the will and I witnessed it."

She was read the last portion immediately before testator's signature and asked if she read that, and her answer was:

"A. Yes, I am sure that I looked at that but I know that by heart and I just looked at it and put my name there."

And again:

"A. Yes, I know it was signed that day."

After being asked many questions relative to whether anybody called her attention to the mental capacity of Mr. Eppinger and after she said he appeared to be perfectly all right to her, she was asked about the location of the office spaces, all of which she described, and then she was asked:

"Q. Was this signature of Mr. Eppinger already on the will when you got there? A. It was not. He put it on the will in our presence."

Mrs. Nancy M. Duffy, an employee of the First National Bank for 23½ years, stated that she and Mary Ryan had known each other intimately since they were in school together and she was familiar with the genuine signature of Mary Ryan, having had access to it and seen it over a long period of years there in the bank, in their office work together on documents, papers, and checks; that Mary Ryan was with Caldwell & Hicks Insurance Agency for thirty years. She was handed the propounded document and asked to state whether or not in

her opinion the name "Mary Ryan" was in her genuine handwriting. She examined the instrument and answered:

"Yes, I'm sure that's Mary Ryan's signature."

She also stated that she had known John S. Eppinger for a number of years, had seen his handwriting, and his signature on a good many checks and papers that had been handled there in the bank. She examined the name of Mr. Eppinger written on the propounded instrument and stated that in her opinion it was the genuine signature of Mr. Eppinger. She pointed out the characteristics in the written signature and certain particular letters therein, which she stated were peculiar to his genuine signature, and said she had transacted various business matters with him. She is Assistant Vice-President of the First National Bank.

Mrs. Elizabeth Dolithite stated that she and the deceased Mary Ryan had operated the Caldwell-Hicks Insurance Agency for a number of years together; that she was familiar with the handwriting of Mary Ryan, knew her genuine signature, and on examination of her name on the original will, this witness stated that it was the genuine signature of Mary Ryan.

Walter Key, member of the law firm of Pigford & Key, since 1951, and son of W. N. Key, the elder member of the firm, was introduced by proponents, counsel therefor, stating that they desired to examine him at that time only relative to the execution of the will, and reserved the right to examine him further on other features of the case. Counsel for contestants cross-examined him extensively. He was introduced in rebuttal.

On this first examination he stated that he knew Mr. John S. Eppinger most of his lifetime but knew him well during the last three or four years; that he had transacted legal business for him, personally conversed with him, and that in the course of his business relations with Mr. Eppinger, he was requested to prepare him will; that Mr. Eppinger had discussed with him the contents of the will over a considerable period of time, inquired about making disposition of his real estate and personal property, and how it would be affected by gift and estate taxes. He identified the original paper writing as the will of John S. Eppinger that was prepared for testator in his office and said that Mr. Eppinger requested him to prepare a carbon copy of said will, all of which he did, and that he was present when the will was signed and executed by John S. Eppinger, saw him sign his name to it, both the original and the carbon copy; that both Mary Ryan and Corinne C. Hudson, the attesting witnesses, were there present with him; that Mr. Rowland was also present and that Miss Ryan and Mrs. Hudson signed their names as attesting witnesses; that all the signatures were made there in the presence of each other.

In response to a question about whether anything was said by him or by Mr. Rowland at the time they were all there in the room together, to Mr. Eppinger and the witnesses about the execution of the will in the presence of each other and the witnessing of it, he said:

"A. * * * I asked him and in the presence of Miss Mary Ryan and Mrs. Hudson, did he declare that to be his last will and testament and that he requested that they sign in his sight and in the sight of each other and they both—he said that that was his will and they all signed in the usual order. In fact I read

—after I said that—I read the attestation clause to the three people sitting in the office."

He further stated that Mr. Eppinger was over 21 years of age at that time and a citizen of Madison County. He said that Mr. Eppinger went over every line of the will diligently, page by page, and knew what was in it, before its execution. He said that he had had conversations with Mr. Eppinger two or three times every week for some weeks immediately before the preparation and execution of the will and, in his opinion, Eppinger was a man of sound mind. He said that Mr. Eppinger had been doing some legal business with the firm for three or four years; that the firm had represented him in a suit against Pinky Cantrell, and was representing him in connection with the condemnation proceedings with respect to certain real estate of testator by the City of Jackson.

On cross-examination, he was asked about the relationship he had with Eppinger and his examination of the place where Eppinger had died and the description of the enclosure in which his body was found. He described that enclosure as being a reasonably airtight box except the top and that it was painted inside and caulked. He further stated that it was his opinion that there was no way to enter that enclosure except from the top at the time Mr. Eppinger took his life, however, that the Police had been to the place and certain fire extinguishers had been taken out of the enclosure before he, the witness, got there; that he did know there was a photograph taken of that enclosure. There appears in the record, properly identified, two of such photographs as Exhibits 10 and 11 of contestants.

The witness was asked about certain clippings which were supposed to have been found in the home of Mr. Eppinger, which the record indicates were from newspapers and magazines making some reference to suicide, and particularly, as to whether the witness had seen them or had them. He said he did not find such clippings, did not have them but had seen some clippings that came from Eppinger's home. However, the witness did not state whether they made any reference to suicide or not. He was further asked as to who did the actual typing of the will in question and stated that Mr. Rowland did that. He was asked who suggested that the property be put in trust and stated that Mr. Eppinger made that suggestion. The pertinent questions and answers in this record are as follows:

"Q. Did he discuss with you the fact that he wanted this put in some kind of trust so that it would make some difference in his taxes some way? Did you suggest that to him? A. No, we didn't suggest how he directed his property to go.

"Q. You mean Mr. Eppinger himself advised you he wanted a trust estate established and used that language? A. Yes, sir, he did.

"Q. And he told you at the time that he wanted you people to be the trustee? A. Yes, sir.

"Q. Did he tell you that he wanted the bank to be trustee too? A. Yes."

He further testified that Mr. Eppinger requested both personal and corporate trustees, made the suggestion that the three personal trustees and the corporate trustee named in the will be such and also that if there was a

conflict between the personal trustees and the bank that the opinion of the attorneys would be controlling. He was asked about certain of the legatees and stated that Mrs. Charles Schmuck was not a blood relative of Eppinger but he did not know that until after Eppinger's death, and he said further that Mrs. Jackel was a maternal relative of Eppinger. He further stated that Eppinger never mentioned Mrs. Curry to him and he never heard of these other relatives not mentioned in the will until they came to the funeral home the night before the funeral. Many photographs of the residence occupied by Eppinger at the time of his death were identified by the witness on cross-examination and filed as exhibits of the contestants, and he was asked quite a bit about the arrangement of furniture and other things found in the home, and that part referred to as the office and tools.

At the conclusion of these witnesses' testimony, the proponents offered the will for probate in solemn form. This was objected to. The court ordered the jury to retire, heard argument of counsel, and the objections were said to be:

"* * * that the will was not properly prepared and signed by the testator, properly acknowledged by the testator and proof has not been offered on that to establish this as a will, and even the paper writing that this witness saw was only the last page of it and that is all that she was signing at the time she signed it."

During that argument, the following motion was made by counsel for contestants:

"Comes the contestant and moves the Court that a judgment be granted in her favor and that the will not be admitted to probate for the following reasons:"

There then appears a statement, somewhat disconnected, but relates to the fact that the legatees and devisees had not made bond as required by statute, and asked for a judgment in default against them. The Court overruled that motion, saying:

"The motion will be overruled. Let the will be admitted to probate."

Thereupon the original will was filed and the signed and witnessed copy was also filed and put in the record, and the original read to the jurors by counsel for proponents.

The learned trial court's action in holding that the execution of the will as provided by law, admitting it to probate and permitting it to be read to the jury as evidence, was most correct. Further reference to the execution of the questioned document as the last will and testament of the testator will be hereinafter referred to in our further examination of the record on the issues of incapacity and undue influence, but the assignments of error attacking the execution of the will are overruled.

■ The substance of the testimony of contestants' witnesses which has any bearing whatever on the question of undue influence or mental incapacity is of a type of scintilla or glimmer evidence upon which no verdict, except one which might be based upon pure speculation, could be returned against the will.

On the question of mental incapacity, learned counsel for contestants have pointed to only two statements by

any witnesses that testator was at any time incapacitated to make a will. One was by a man named Helton and the other witness was attorney Roger Murray who confined his statement about incapacity to the date of the suicide.

The contestants introduced, on direct examination, 29 witnesses. Look first to the testimony of this witness, J. N. Helton. He never saw Eppinger until they were tearing down the houses the city was taking, and then only for a few minutes at a time, and Eppinger said: "Don't tear down this here toilet, don't tear up them commodes". Next day he heard testator say: "Don't tear down that house over there." About some scrap lumber, testator said it was reserved. During a shower, testator walked around looking at the scrap lumber. This witness was permitted, over objection, to answer the question:

"Q. Mr. Helton, was Mr. Eppinger of sound mind on that occasion? A. I wouldn't think so."

His evidence as a whole does not rise to the dignity on which a speculation verdict could be sustained.

Witness J. N. Carpenter went to where Eppinger was at work to pay him his rent and Eppinger said: "Don't bother me when I'm busy, get out of here and stay out of here." He expressed no opinion as to the mental capacity of Mr. Eppinger.

Kenneth Pierce, a boy 16 years old, described the testator's actions, saying he saw: "Nothing, only he was just, you know, was trying to stay away from other people, is all, and he wouldn't hardly speak to nobody," and "looked at the sky a lot".

Buck Varnell, renter of a piece of business property from Eppinger's father, and thereafter from testator, for a long number of years, said the father died in Memorial Hospital. Witness went to testator and told him about it, saying:

"I told him that they wanted to get him out of the hospital and he said that he was busy and didn't have the time and so I told him well, we've got to get him out. So I went back and had him moved to Griffin Funeral Home."

He was again asked if testator told him he was busy and didn't have time to go up there, and he said: "Yes, sir, something like that". He was then asked and answered:

"Q. John knew his business, didn't he, insofar as his property was concerned? A. Yes, sir.

"Q. And you never did observe at any time any inability on his part to look after his property and financial affairs, did you? A. No."

The next witness, George Williams, leased a mercantile building belonging to testator on a long term lease. There was some threatened lawsuit about the lease and that Eppinger thereafter did not cash the monthly rent checks for about a year. On cross-examination, he was asked and answered:

"Q. From your experience with him would you say that he was a man of sound mind. That is that he knew what he was doing about his business? A. I thought so."

The next witness for contestants, Charlie Buntin, Sr., 55 years old, stated that Foster Bridges was "the closest

person to John Eppinger''. The witness said he was a very good friend of Eppinger; had known him all his life; was in school with him as a boy, and that he went down to his house a number of times, talked with him many times, saw him when they were tearing down the houses; that he was there for the purpose of listing the number of houses and their street numbers; that Eppinger said he thought he ought to have $30,000 for the property that the city was taking. He discussed with testator then about buying a farm together when he got this property sold, and that Eppinger said:

"Charlie", he says, "I wouldn't mind buying the farm", but he said "they tell you how much you had to do" and he said "this other world would not be any worse than what we are living in."

That conversation was in April, 1957. He later saw him and talked with him every day or two, usually finding him in the garage there at work. He said the last time he saw him in Roger Murray's office was about the middle of May, looking for Mr. Murray; that he saw him about two weeks after that, was talking to him about his money, and this conversation occurred:

"The witness: Judge, can I say what he said?

"The Court: Yes, sir, go right ahead.

"The witness: And I got some kin folks I ain't a dam bit proud of either and he said to me, he said— I asked him to give Lambuth College some money, that's the way it came about.

"Q. You asked him to give Lambuth College some money? A. Yes. And he said: 'Well, Charlie, I don't owe Lambuth College anything but I am going

to take care of Union University. He said, I've got some kin folks and I don't want them to have a dam thing I've got.' ''

The witness detailed much about his association with the testator from boyhood. On cross-examination he told about how the testator as a boy was reared, saying of his mother:

"She didn't want her child with us because we'd teach him bad tricks so I think that is one of the things the reason why John grew up in that he wasn't—he was the most appreciative human you've ever seen if you did him a favor.''

He told how testator looked after his property after his father's death:

"Q. And was John looking after all of them? A. Yes, sir.

"Q. The upkeep and renting? A. That's right. See his Uncle Loui died first, then that naturally went to Mr. John. Then when Mr. John passed away then John Eppinger took it over himself.

"Q. Did John look after his business affairs carefully? A. Yes, sir, I would consider him a very conservative man and he had sense enough to know now to make money and save it.

\* \* \* \* \* \*

"Well, he's got one of the best equipped shops I know of anywhere. He's got every piece of machinery to work with. He had every tool in the world

to work with and he had quite a bit of new stuff that he had never used.

\* \* \* \* \* \*

"Q. Was he an expert mechanic? A. He could do anything, he was a German and you know the German people are considered the smartest people in the world.

\* \* \* \* \* \*

"Q. All these conversations and contacts you had with him all up to a few days at the time of his death, did you find him to be normal, and in the same frame of mind and state of mind that he had been all these years? A. Yes, sir. John was a very peculiar human. He just didn't want to be dictated to.

"Q. But when it came to any sort of business transaction, he was alert and keen of mind? A. Yes sir, he knew what he wanted to do too.

"Q. He was not pleased about the City taking his property? A. No, sir."

This witness stated on cross-examination that the testator had told him he wrote his will and on re-direct examination he was asked and answered:

"Q. Mr. Buntin I believe you said that he said he wrote his will himself. Did you see the Will? A. No sir I didn't see it because he didn't let nobody see any of his private business.

\* \* \* \* \* \*

"Q. He said he wrote it himself? A. The way Mr. Ragan that came up: When I asked him to give me

some money for Lambuth College he said I have already made my will and I am going to give to Union University and that I don't owe Lambuth College one penny.

"Q. That he had prepared his will himself? A. Yes that was in June when he was telling me about that."

Mr. Charlie Warmath, a member of the jury of view, went with Mr. Key to the property and, as he remembered, there were 15 or 16 of the houses, valued by the jury of view at $12,000. This witness was called by contestants and stated that this property was average negro property, with some windows out, some paint off, some occupied, and that the jury of view, when they looked at these properties, was shown them by Foster Bridges.

Captain William Cole of the Jackson Police Force for approximately 20 years, introduced photographs of the container in which the body was found. He said he saw some clippings from papers or magazines there in the room, one or two of which referred to people having committed suicide, but he did not have the clippings.

On cross-examination, he said he had known John S. Eppinger for 20 years; that he had talked to him quite a few times; that he had talked with him last about four months before he committed suicide, and he further stated that from observation and experience and the conversations with him, his conduct and demeanor, he was a man of sound mind. On re-direct examination, he said he was a man who was peculiar and seemed to want to live by himself.

Luther Pierce, father of the 16-year old boy who testified for contestants, said he bought from the city some of the condemned houses, tore them down, and that at that time he saw the testator occasionally; that on one occasion testator stopped and appeared to look up—"looked up through that little sycamore tree that was standing there, looked up in the sycamore tree". On another occasion, he saw testator at his shop, walked up there and spoke to him and that testator said "Hi", turned around and kind of "looked up" and told the colored boy to get the truck out, and they went off towards town in the truck.

Another witness, Ernest Miller, Manager of Williams Shoe Store for the past 7 years, corroborated the testimony of Mr. Williams about testator holding the monthly rent checks before depositing them, for as long as 14 months and that they were deposited in the bank on June 6, 1957. He said that during the time Mr. Eppinger was holding the checks, he understood that Eppinger and George Williams, the leaseholder, were having some controversy over the pending lease.

The court permitted one William Usery to testify in the presence of the jury, over objection of proponents, that Foster Bridges had told him, after the death of Mr. Eppinger, that Eppinger had been in an institution for the insane. He said this conversation occurred in the presence of Kenneth Pierce, the young boy who had previously testified, and Usery first fixed the time as being in July, 1957, after testator's death, but said it was while they were tearing down the houses involved in the condemnation proceedings.

On cross-examination, he said that he did not know what mental institution he was talking about and finally said he did not know whether it was John F. or John S. Eppinger—the father or the son. Any probative value of that statement is practically destroyed by the cross-examination. He could remember nothing else that he claimed Foster Bridges said. At the conclusion of his testimony, counsel for proponents moved that it be stricken. Acting on that motion, the court said:

"The Court is admitting that as admission against the interest of Foster Bridges only, and the objection will be overruled."

Mr. Ragan introduced himself as a witness for contestants and made a statement under oath, in narrative form, to the effect that at one time a house on the corner of "Jefferson and Jefferson Alley" which belonged to Mr. Eppinger, had burned to some extent and remained in that condition for about five years; that he saw Mr. Eppinger and approached him about buying that house and Mr. Eppinger said: "Its not for sale". This, nor any other statements made by Mr. Ragan in his direct testimony, has no bearing whatever on the issues in the case.

On cross-examination, he was asked if he had made a diligent investigation to find out whether or not testator had ever been in an institution. He answered:

"Now, I did not make a diligent investigation and I did not check for the recent years on, because I originally heard that back at an anterior date, 30 years ago that that happened, and I checked back in those dates but I have not checked for a period of the last ten years, or something like that."

426

He was asked about when Mr. Usery first told him about that information. His answer was:

"Mr. Usery first told me that, it has been somewhere around three or four or five days ago. I had a job finding Mr. Usery after I heard this information, but I finally caught him."

He was further asked:

"Q. Well, do you know of any institution, of your own knowledge,—do you know whether or not as a fact he was ever committed to an institution? A. Well, nobody knows as a matter of fact there, Mr. Moss, unless they go down, and unless they attend the proceedings. I don't know, no, sir. I know that there has been some evidence on it.

\* \* \* \* \* \*

"Q. Have your clients, the contestants, do they know whether or not he went to an institution? A. I don't know what they know but they have not advised me that he did go to an institution and as far as they really knew about the case."

Chester Lee Parish bought the Varnell barber shop which had been operated in the Eppinger building and went to the home of Eppinger and inquired of him if he could lease the building for two to five years. Mr. Eppinger said: "Is there anything else?" The witness said: "No, that is all". Mr. Eppinger then closed the door and walked back in the room. The witness explained that this occurred at a time during which there had been some misunderstanding between Mr. Eppinger and Mr. Varnell about the increase in the rent.

The witness, Charlie Coble, wanted to rent a building from testator in which to run a barber shop and testator advised him he would not rent it to a barber under any circumstances.

Witness John Drake gave no competent testimony whatever.

Witness Hobart Spencer undertook to prove an immoral act which he admitted occurred 20 or 25 years ago. The witness had been in Lake County for 19 years and he claimed the act occurred in Madison County. Testator put him out of the house he was renting. His testimony is an insult to the issues involved, has no bearing whatever on the issues of incapacity or undue influence, and no bearing on the veracity of any witness.

Witness V. L. Kearney testified to nothing other than that there was a difference in testator's valuation of the property which the city was taking, and that of the jury of view.

The testimony of witness Wm. Holland, Jr. was to the same effect as that of Mr. Kearney, with the further statement that there was no asbestos siding house on a lot belonging to testator that was condemned.

Mr. Hugh Harvey, Clerk and Master, simply testified to something which the delinquent tax records showed, which had nothing to do with the issues involved.

To the same effect was the testimony of Mr. William Bond, circuit court clerk.

Mr. W. N. Hearn, City Building Inspector, simply stated that he condemned two Negro houses belonging to testator which were out of repair, one of them being partially burned; that after the condemnation Eppinger

was given a reasonable time to repair the property, with no definite date set to complete it, and the last time he made an effort to get in touch with Mr. Eppinger was about 8 days before he died. His testimony was absolutely worthless insofar as concerned the mental incapacity of testator, or undue influence in connection with the making of his will.

Mrs. Mary L. Grace, daughter of contestant Mary Smith Curry, stated that her mother was the first contestant in this case, had been paralyzed a long number of years, and had not been able to go about. She offered this as a reason why there had been no association between the testator and this contestant. The witness admitted that she did not even know whether testator had known her mother for a long time or not, and she gave as reason for not visiting the testator herself, that she had been busy.

Mrs. Frances Martin, who appears to be a sister of Mrs. Grace, testified that her mother sent the testator Christmas cards years ago; that there was no visiting between them; that she saw testator at his father's funeral and on the street once since; that he never visited her or her mother.

At the conclusion of contestants' evidence in chief, proponents moved for a verdict supporting the will. Contestants moved for verdict supporting the contest. Both were overruled.

It should be here stated that thereafter proponents introduced 27 witnesses in rebuttal, among them being Melvin L. Rowland, hereinbefore mentioned as one of the

executors and trustees, and Dr. H. H. Boston, Vice President and Head of Capital Enlargement of Union University. By Mr. Rowland several rough copies of the proposed will of Eppinger were shown as exhibits and also introduced by him were certain notes that were taken at different times in discussions with Mr. Eppinger before the final draft of the will was prepared and executed, and one of the most convincing exhibits relative to the capacity of Mr. Eppinger to understand the nature of the disposition of his property is Exhibit No. 1 to the testimony of Mr. Rowland, which is shown to be written by Mr. Eppinger, consisting of five sheets of paper and which is a memorandum describing his property in a general way, the disposition he desired to make of it by his will, and the trust provisions he wanted in a general way, all written by testator as a working copy memorandum. There is also introduced by Dr. Boston a typewritten letter addressed to him on two sheets of paper signed by Mr. Eppinger, with which was enclosed what he described as:

"a valid copy of my Will, signed, sealed, etc."

and in the same type as the memorandum of five sheets referred to above. There was also filed as an exhibit a letter from Dr. Boston to Mr. Eppinger, which immediately followed his receipt of the letter containing the copy of the will, but there is no necessity for it to be shown in this opinion. Testator's letter to Dr. Boston is as follows:

"Jackson, Tennessee
"163 Highland Avenue
"July 2, 1957

"Dr. H. H. Boston,
"Vice-President
"Union University
"Jackson, Tennessee

"Dear Sir:

"I am addressing this letter to you as financial officer of the University as I understand you to be.

"I am wondering if I can make an arrangement with Union University that would be mutually desirable?

"I am enclosing a valid copy of my will, signed, sealed, etc. After reading it and noting the University's interest in same on page twelve, possibly you will be interested in the requests that I would like to make in this connection.

"My first request is for the University, as a continuing institution to act as custodian of this will until my passing. Then see that this will is probated properly. As I have no immediate family I would like very much to see the residue go towards helping the education of young people.

"My second request is that this matter be kept entirely confidential until the will is probated.

"This is entirely a matter of insuring that this money goes to that end that I regard as eminently desirable, as sometimes wills become inadvertently lost or mutilated. And of course if this happens

the will is worthless. I have the original in my bank box.

"If this sounds desirable to you, would you kindly drop a note to me at the above address and retain the will for your files? If you do not like this arrangement or if you do not have the facilities to act as custodian, would you kindly send the will back to above address by registered mail?

"I would have called in person but my health is not very good and I do not feel well enough to make a personal call. Besides it can be handled readily by mail.

"Trusting this arrangement will be found satisfactory, I remain,

"Very truly yours,

"/s/ J. S. Eppinger

"J. S. Eppinger"

After testator received Dr. Boston's letter, he called Dr. Boston by phone and very courteously thanked him.

The testimony of Mr. Rowland in no way conflicting with the testimony of witnesses for proponents and in every way supporting the testimony of Mr. Walter Key, shows conclusively that the questioned will was being prepared over a period of several weeks, and without contradiction it shows that the testator, not only knew how he wanted to dispose of his property but that he discussed every step in the administration of his estate with the attorneys preparing his will and had a very intelligent understanding of the proper administration of an estate under a trust.

We think it would be reasonably clear if our conclusions were here stated and this opinion concluded, but in view of the fact that we must determine from all the proof whether or not it furnishes any reasonable grounds for the minds of jurors to disagree, and that the testator committed suicide relatively soon after his will had been executed, we prefer to call attention to the language used in Cude v. Culberson, supra, and then conclude this opinion with reference to other evidence introduced by proponents. In that case, Judge Anderson said [30 Tenn. App. 628, 209 S. W. (2d) 514]:

"The mental condition of the testator at the very time the will was executed is the question in issue, but in ascertaining this condition at that time, evidence of his mental and physical condition before and after making the will is received within reasonable limitations. His appearance, conduct, conversation and declarations, together with any well marked change of character or habits without sufficient cause, and any other particular fact or facts from which the condition of the testator's mind at the time in question may be inferred, are competent on the issue of testamentary capacity. Bridges v. Agee, 15 Tenn. App. 351, 355, 356; Sizer's Pritchard, Sec. 111; Note 68 A. L. R. 1311, 1315."

Mr. Hugh W. Hicks, at that time President of The First National Bank of Jackson, who had known testator from childhood, his father and mother, and in a business way, known testator more intimately since 1951, said:

"I'd known him since he was in his childhood and had contact with him subsequently, prior to his

father's and mother's death and after that. Afterwards I contacted him about renting the building just north of our building on their built property facing on Market Street.''

\* \* \* \* \* \*

''and I mentioned the fact that I didn't know of anyone that he was obligated to or owed anything and would like to have that so that we could expand in that direction. And asked him the question of what he intended—a man like you, a bachelor with no immediate heirs or relatives; what in the world you intend to do with it, we could work you out a better deal on that and he said, Well he intended to set up some scholarships at the University.

''Q. What University? A. Union University, and if he changed his mind he would let us know.''

As to his parents, and particularly his mother, this witness said:

''In my belief and knowledge she was as normal the last time that I saw her as she was at any time I ever knew her.

\* \* \* \* \* \*

''John's parents were devoted and tender parents, they were wrapped up in him. He didn't have to my knowledge very close childhood friends. He was —Kindly the three of them or Mr. Schmuck was living there and they were very closely knit through and John became a very vociferous reader and would discuss occasionally something that would come out. He had a pretty good depth of understanding.''

When asked his opinion relative to the testator's soundness of mind, he said:

"Yes, sir, I think he was. I think he was a man of determined views and that he had a calculating mind and he solved his own affairs to suit himself and in all the experience I had with him I believe he knew what he was doing."

Mr. Clarence Wall, a contractor, lived as a neighbor to testator from 1948 to 1953 or 1954. He detailed his transactions with Mr. Eppinger, his associations with him, saying:

"Yes sir, I saw him a lot of afternoons. I'd you know, just a neighbor, I'd come in at 4 o'clock or 5 you know and he was always working in the back and I'd just go back there and talk to him and he was, I guess, just a neighborly conversation and nothing important about it or anything. That's about the only way I knew him."

When expressing his opinion as to testator's mental condition, he said:

"I'd have to say that he was a man very shrewd and a sound mind."

On cross-examination, he said that he did not remember seeing the testator during the last two or three months of his life.

Douglas Murray, who has lived in Jackson for 53 years, was called by proponents, and testified that he knew both the senior and junior Eppinger intimately from 1919; that he knew John S. Eppinger until he died and there never was any question about his mental capacity to his knowledge; that the last time he talked to testa-

tor was in June of 1957; that they were out there where the houses were being torn down; that they talked about how long the witness had lived there in that area, about a cow barn over there where a man named Conklin kept some ponies; talked about going fishing; and when asked about testator's mental condition, he said:

"He was just as sane as he could be the day I talked with him."

On cross-examination, he said they had not visited each other's home.

Attorney Roger Murray was introduced by proponents who testified how closely he had been associated with testator, saying he had represented him since his father's death in 1947 up to a few months before his death; that he represented testator as administrator of his father's estate; that Mr. Eppinger had sold some 75 lots or parcels of land and he had drawn the deeds and trust deeds on them; that he wrote the leases for the William Shoe building and the Buck Varnell barbershop property; collected notes for him and personally knew that testator looked after his own property. He said:

"John was a very good lawyer himself in my estimation.

\* \* \* \* \* \*

"he would write out these lease agreements and I would look them over and prepare them and he would write out all these easements and he would prepare trust deeds and help on that line.

\* \* \* \* \* \*

"John was a very smart business man.

\* \* \* \* \* \*

"I think John and I were pretty close friends. John didn't have too many close friends. He sort of stayed aloof and of course he had some peculiarities. John and I were very close. I'd send him Christmas cards and he'd send me Christmas cards and I'd go down to see him occasionally.

\* \* \* \* \* \*

"I think John was very normal and very sane and a very intelligent man, all during my lifetime—up— I saw him up—maybe a week before he died.

"Q. Did he appear that way then? A. Yes, sir."

In a question propounded to him, it was stated that some reference had been made that possibly John S. Eppinger had been in some mental institution, and he was asked:

"Q. Do you know whether that is true or not? A. That is not true, so far as I know, I never heard of it."

He further stated that through all the years he had known him he had never seen any change in his mentality, his disposition or characteristics.

On cross-examination, he said he and John had talked about retiring and that Mr. Eppinger was always "kidding me about going to Florida and retiring", and in these conversations he said that Mr. Eppinger had said that "the next world couldn't be any worse than this one". He was then asked:

"Q. Mr. Murray I believe you said that you thought he was a normal, intelligent man. I'll ask

you if you did not tell me that you always thought he was but anybody that would kill himself like he did, he wouldn't be all there? A. Well I don't think any man who commits suicide is right at the time he commits suicide, no sir. I don't believe a sane person would take his life.''

This witness testified that he was in high school with testator, played football and went swimming with him, and grew up with him. He stated how Mr. Eppinger and another friend of his, a Mr. Cantrell, had gotten into a legal controversy and he refused to represent either one of them because they were his friends; that this occurred in the latter part of 1956 or early part of 1957; that testator had conferred with other lawyers after that and had been back to his office on occasions, and that he had done 90% of his legal work in the past ten years prior to his death. He further stated that testator went to Union University sometime in the '20s, he thought, after World War I in 1917 or 1918.

Dr. Donald Koonce, a licensed physician, said testator was a patient of his from December 9, 1955, had a mild arthritic condition in his knees and ankles, and mild elevation of blood pressure. He gave him a thorough physical examination and saw him at fairly frequent intervals until September, 1956; that he put him on a reducing diet and testator was very co-operative, lost considerable weight, and that the medication and loss of weight brought his blood pressure down to essentially normal when he last saw him. He told of conversations he had with him, had an opportunity to judge his behavior, and when asked about his mental condition, he said:

"A. During the examination, the initial examination and the subsequent examination I did have an opportunity to observe his behavior and its my considered opinion that he was in perfectly sound mind during the times that I saw him. * * * I detected no unusual mental changes. He certainly seemed to possess his mental faculties at all times when I observed him, I saw no indication of any mental abnormality."

On cross-examination, he stated the testator mentioned about making up his income tax report, worried about that some, but that he did not seem to be unduly upset about that situation.

Mr. J. D. Parker, a retail lumber and building material dealer in Jackson, partner of Conger & Parker Lumber & Supply Company, testified that he had known John S. Eppinger since 1928; that he had come into the business from time to time and bought materials; that Eppinger had a number of houses, looked after them and worked on them himself; that he had seen him occasionally throughout all the years from 1928 to the middle of June, 1957, had talked to him at various times, not only about the building material but about the way the government ran its business and threw money away; that he was no different when he saw him the middle of June 1957 than he was on other occasions; that based upon his association with testator, doing business with him and talking with him, in his opinion he was of sound mind.

On cross-examination, he said that testator was generally disturbed about the way the economy of this country was being handled, and when this witness was asked

about whether the testator was intelligent and informed, he said:

"Yes sir, I would, he was very well read and showed it on numerous occasions that he was well read and had gone into a lot of subjects and much deeper than the average person."

The next witness for proponents, Mr. Cartmell Townes, circuit court clerk of Madison County for 16 years and working at the time he testified as Deputy Tax Assessor, said he knew testator for 25 or 30 years, when he would come to the clerk's office to see about his property with reference to taxes; that on occasions he would sit down and talk with him or with Mrs. Hobson, a deputy clerk, and after detailing his observations, etc., he said in his opinion the testator was a man of sound mind.

Mr. Mike Glenn, in the roofing, building and construction business for 35 years, said he knew John S. Eppinger during his lifetime, did business with him, had done repair work on his buildings, including the Diffee Drug Store building, which was about six months before testator's death; that he had occasion to talk with testator, that testator would tell him just what he wanted done, and that in his opinion testator was a man of sound mind during all the time he was dealing with him.

Foster Bridges testified for proponents, saying he had lived in Jackson since 1930, had lived in the area where the houses of John S. Eppinger had been condemned and were being torn down all of that time and up until he moved to 118 Vanden Alley, which is owned by tesator; that he drove a truck for the Eppingers from 1937 up until 1957, about July 15, 1957. He was asked about the

death of testator's father and mother, and was then asked:

"Q. And that left who there at home, if anyone?
A. My boss-man what died here the 15th of July."

He further said that after the mother died, the father and son would send out and get their meals and have them brought to the house, but that when the father died, Mr. John S. Eppinger had the witness get his meals at a boarding house operated by a Mrs. Spain, and bring the meals home just like he had during the years. He would carry an empty basket, leave it at the boarding house and pick up a basket where the meals were prepared and go right back to the house. He, the witness, washed the dishes, mopped the kitchen, cut the yard, and that after Mrs. Spain moved away, he and Mr. Eppinger would go to the grocery store, buy the food, and Mr. Eppinger cooked it himself; that he continued to do the work around the house until the day Mr. Eppinger died; that he and Mr. Eppinger went to the grocery on July 15, 1957; that he had some chickens and that they raised a garden; that his wife would occasionally dress a chicken, get things out of the garden, and he would carry them to Mr. Eppinger. The witness said he had a granddaughter 9 years of age named Mary Ann who would bring a glass of ice water down to him at the shop and bring one for Mr. Eppinger, and he would give her "pennies and things". The witness described in detail the workshop of testator and how he had every kind of a tool he needed; that he would cut lumber sometime for a whole house there in the shop; that testator did his own repair work, fixed his car and truck, and had all kinds of machinery to do it with. He described how he had several sheds full

of building material. He stated that Mr. Eppinger was a man who read a lot, did his own rent collecting, and that he would see him up very late at night on some occasions. He said that all he knew about the property being condemned was that a man brought some papers down there and told us to "be gone the first of May." Witness moved from a house that was being torn down to another one on the 2nd of May, but came back to Mr. Eppinger every day and saw him every day; that the last time he saw him alive was the 15th of July, 1957, at six o'clock, out at the shed, and that he acted just like he had since 1937. He described the daily routine of the testator.

This witness said he did not have any certain salary, but that testator would give him a check for some amount and when he spent it he would go ask him for more and he would pay him more; that he knew nothing about Mr. Eppinger making a will; that he never mentioned making a will to him. He was asked whether or not he had ever heard of testator being in an insane asylum, and his answer was: "No, sir". He was then asked if he had ever told a boy named William Usery that testator had been in an insane asylum, and he said:

"I couldn't have done it. I've been right beside of him ever since 37. * * I don't know who you are talking about, but I ain't told nobody in the world that. Not nobody in the world. * * * I ain't heard nothing about it."

He said the day the body was found, he was up at the house that morning and then went to the shop to work. Mr. Eppinger did not come out and he went back to the house, noticed a light and a thing he called "a trap;"

that he went again to the shop and worked until about time to go to lunch, went back to the house, saw the same light, but could not see anybody; went home to lunch, came back, looked up at the house again and saw the same thing, waited around until about 4 o'clock and Mr. Eppinger did not come out. He went back to the house, listened around and could not hear anything and "couldn't hear him snore", went and called Mr. Guy Johnson and then later Mr. Roger Murray, who called the Police and they found the body. The witness said that Mr. Eppinger had two typewriters there in the house and that he wrote on them. Witness said the last time he went into the room where the body was found was on Monday after the 4th of July and that he noticed nothing out of the way, saying: "Things was just like they had been for the last twenty years." He said Mr. Eppinger was down at the shed at the time and that the reason for his trip up to the house was to get some six penny nails that were there in the house.

On cross-examination, he said that the testator was "the best friend I had", and that he was "the only man I worked for since I've been in town". He was asked much about whether he cut out the lumber from which the box was made in which the body was found. His explanation was:

"I don't know, I didn't take no check on that nor nothing; I wasn't thinking about nothing like that, what I was cutting out. I cut out steps and we make kitchen cabinets and we do all kinds of cutting out work there and at times we would cut out a whole kitchen cabinet and cut out half of a house, just pile it up there, and if the rain catch us we just lay it aside."

He said he did cut out some plywood or something like that about two weeks before Mr. Eppinger died, but later he said he did not understand what was asked him and he didn't know when he cut that.

One of the most detailed reports of conversations, actions and conduct of attorneys and client is shown by the testimony of Melvin L. Rowland. He gives the dates on which testator discussed some features of the will with members of the firm of lawyers, on many occasions when two of them were present and a few when all three were present. He explained that he could give these dates because while he was working for the government he was required to keep a diary of his activities and he had followed that procedure as a lawyer. Discussions between the attorneys and testator relative to the making of a will were first begun when testator was in the office in conference with his attorneys in connection with the taking of his property by the City of Jackson on March 26, 1957. These consultations with respect to both matters continued until May 29, 1957 when the final draft of the will was executed. Testator saw these attorneys and discussed some features of the will with them on April 17, 18, 23, 24, 30, May 4, and on May 6 when Mr. Eppinger delivered to them the 5-page memorandum (Exhibit 1) he had prepared as a sort of first outline of his property and what he desired done with it. Again on May 7, 9, 10 and 13, when the handwritten rough draft had been completed and discussed with testator. Again on May 16 and 20 when a second rough draft was prepared and turned over to testator. Again on May 20, 22, 23, 24 and 27 (see Eppinger's memorandum to second rough draft, Exh. 5), during which time a third rough draft had been prepared, and on May 28 when a final draft was prepared,

turned over to Mr. Eppinger together with the carbon copy of same, and by him kept overnight, brought to the office of his attorneys on May 29th where it was executed.

Suffice it to say that explanation was fully made as to why it was not necessary to mention any persons with a $5 bequest, and a full discussion of the matter of avoiding the creation of a perpetuity; also minute details relative to the administration under trust provisions.

There is no record of any case, called to our attention or which we have found in making our research, where any more patience, consideration, attention, explanation, and sincere effort on the part of attorneys to prepare a testamentary document in every respect explanatory and legal to meet the expressed desire and instructions of a client. May it be further said that the same patient, careful and intelligent explanation of his ideas in expressing his desires was made by the client relative to the preparation of his will. All the discussions together with the document itself and how the testator provided for its safekeeping, reveal the intelligence and knowledge, both practical and legal, of client and counsel exercised in this particular matter.

The testimony of W. N. Key, senior member of the firm, with experience in the practice of law in excess of 50 years, supports the explanation of both the younger members of the firm, Walter Key and Melvin L. Rowland.

I. M. Vaughn, former trustee of Madison County, J. N. Allen, County Register, and Mrs. A. R. Darden, Deputy County Register, all testify with respect to the handling of tax matters, trust deeds, etc. by the testator and express their opinion of the complete mental understanding and capacity of the testator.

Webb Howard, who lived a neighbor of the Eppingers for quite a while; Billy Varnell, a renter of a piece of business property of Eppinger; Frank McKinney, Vice-President of the First National Bank of Jackson and who had known Eppinger from boyhood and saw him and talked with him about three weeks before his death; Bebe Boswell, a real estate and insurance agent who handled business for Eppinger; Taylor Robinson, an insurance agent who had handled some insurance matters for Eppinger; and Billy Jack Goodrich, a lawyer who had seen testator many times and talked with him in Roger Murray's office, all detailed an acquaintance with and their personal knowledge of the testator, and expressed their opinion that he was a man of sound mind.

Kenneth Pierce, the 16-year old boy who first testified for the contestants was recalled to the stand and stated that Foster Bridges never at any time said to William Usery in his presence anything about testator ever having been committed to a mental institution.

Attorney Walter Key was recalled by proponents and he corroborated in detail the testimony of his father, W. N. Key, and his associate counsel, Melvin L. Rowland.

Charles Hanebuth, who had lived near and known J. S. Eppinger since he was 8 years old and is the beneficiary under the will of one-half interest in what is referred to as ''a half of a share of stock in the Open Lake Fishing Club'', testified that he had visited testator in his workshop many times, had conversations with him during the last year of his life on an average of once each week, and that during the action of the city in taking his property, he had discussed with testator that proceeding as related to values, right to condemn, etc. several times;

that in his opinion testator was a man of sound mind during all those years and up to the date of his death; that he had noticed no change or difference in his mental condition or otherwise during the entire time. He said the last conversation he had with him was "not over a week or ten days before he died".

On cross-examination, he was asked if he had found out the way and manner in which testator took his life and he answered that he had and was shocked at it. He was then asked and answered:

"Q. You still think that he was sound when he killed himself? A. I am not qualified on that.

"Q. Well do you think that he was of sound mind then? A. I think that man was very smart as I said when I last talked with him."

Miss Clara L. Jackel, the largest personal beneficiary by the will in question, testified that she is the nearest living relative (cousin in first degree) of testator and the only one of such; that as she understood, she would have taken all of his personal property, had he died intestate. She related how she had kept in touch with him through the years; had attended the funeral of his mother, his father, and other relatives and friends of each of them; gave reasonable and substantial evidence to support her stated opinion that testator was a man of sound mind and disposing memory. She further stated that she believed he had made his will exactly like he wanted his property to go, and that in view of her relationship to him, knowing his disposition, his attitude, the way he was reared, and the way he had lived, that he had disposed of his property in accord with his desires and she wanted his

will to be carried out in view of that fact. She gave intelligent testimony as a relative and substantial testimony as an interested party.

We have hereinbefore referred to the testimony of Dr. H. H. Boston. Suffice it to say that it is shown from Dr. Boston's testimony and his exhibited letter that he never knew the testator, never saw him, and that no person had ever solicited the testator to make a bequest to Union University.

It is further revealed by the testimony of Foster Bridges that frequently when he and testator would be making trips in the truck from the place to which Foster Bridges had moved during the condemnation proceedings by the city, that testator would drive a considerable distance by going from that point to Poplar across to Chester, out Chester to Hayes Avenue, then up Hayes Avenue to College Street, and continue around to his shop, which carried him by the Campus of Union University instead of going directly from the place where he would get Foster Bridges to the workshop.

From the entire record it is very clear that the testator was a man who somewhat lived to himself and did not manage his properties in the way and manner that most people would do.

His alleged pecularities and circumstances relied upon by contestants, which their counsel contends make a jury question on the issue of incapacity are these:

(1) He did not keep his dwelling in which he lived in a reasonable state of repair.

(2) He did not keep his rental dwellings in a reasonable state of repair.

(3) He never married and after his father's death, he lived alone.

(4) He used only a Negro man servant to help in procuring his groceries, washing his dishes, and kept him about his premises and work in connection with his rental properties, until testator's death.

(5) He did not visit in the homes of other people and had no visitors in his home.

(6) He went to collect his rents from occupants of his rental houses, which occupants were Negroes, late at night.

(7) He kept some checks which were given to him for monthly rent on business property for several months without cashing them.

(8) He was seen looking up at the sky momentarily on three occasions some few weeks before his death.

(9) He made a remark to two or three people that the next world would be no worse than this one.

(10) He did not devise his property to his relatives.

(11) He refused to sell a house which was left standing after being partially burned, for a long time, to Mr. Ragan, counsel for contestants.

(12) He refused to rent his business property for a barbershop after his misunderstanding with Mr. Varnell.

(13) Finally, he committed suicide 47 days after executing his will by application of carbon dioxide discharged by him in a closely built wooden container, which opened and closed only by a door at the top through which he entered, closed the door, turned on the carbon dioxide from three fire extinguishers, and there died.

The undisputed facts and circumstances upon which proponents rely and counsel contend makes a proper case for a directed verdict in favor of the will, as was done by the learned Circuit Judge, are these:

(1) That the facts and circumstances outlined above, if true, when considered in the light most favorable to contention of contestants, do not furnish any reasonable and substantial evidence to support a verdict against the will, nor can there be any reasonable inference drawn therefrom which could support such a verdict.

(2) That testator attended to his own personal business affairs and did not appreciate interference therewith, nor the effort to take his property against his will.

(3) That his will, the circumstances under which it was prepared and executed, and his letter enclosing copy thereof to Union University, show it to be the product of a legally competent testator at the time of its execution.

(4) That testator did not have any near relatives, but did remember and make a bequest to his nearest living relative, a cousin in the first degree, Miss Clara L. Jackel.

(5) That his provisions for the care of his Negro servant, wife and grandchild who were good to him, is the natural product of a competent testator.

(6) That he had on several occasions expressed the fact that he expected to will his property to Union University, and about the middle of May 1957, while he was in the process of having his will prepared, he told his friend who suggested that he give some of his money to Lambuth College that "I don't owe Lambuth College anything, but I am going to take care of Union University."

(7) That in the preparation and execution of the document which he executed for his will, he had suggested that the original and a copy be executed in the same manner.

(8) That thereafter, and on about 14 days before his death, he inquired who the financial official of Union was, found that it was Dr. H. H. Boston, personally wrote Dr. Boston a sensible business letter, enclosed the executed copy of his will, and forwarded it to him at Union University by registered, mail, received a courteous and thankful reply thereto, and thereafter called Dr. Boston by phone and thanked him for replying.

In the case of Ray v. Leader Federal Savings & Loan Ass'n, 40 Tenn. App. 625, 292 S. W. (2d) 458, 60 A. L. R. (2d) 564, we had under discussion whether or not a gift made where the donor intended soon thereafter to take his life was a gift inter vivos, causa mortis, valid or void. In that case the donor had two living daughters and committed suicide by shooting himself a few hours after he had made a gift to a niece of his deceased wife by mailing

a letter to her enclosing the gift, and taking his life before it reached her. In that case we gave approval to the definition of suicide as found in Black's Law Dictionary, 2nd Ed., p. 1121, as follows:

"Suicide is the wilfull and voluntary act of a person who understands the physical nature of the act, and intends by it to accomplish the result of self termination. Suicide is the deliberate termination of one's existence, while in the possession and enjoyment of his mental faculties. Self killing by an insane person is not suicide."

See also Words & Phrases for other judicial construction and definitions of suicide.

The evidence and circumstances relied upon, other than that of suicide, by counsel for contestants and as related by the several witnesses, furnish no basis whatever nor do they constitute such competent and reasonable evidence upon which an expression of incapacity of the testator could possibly be credited. Neither do these conditions and circumstances, if taken together, which is not the law, furnish a basis for a judgment of incapacity.

If such evidence as is relied upon, other than suicide, might be considered sufficient to carry this case to the jury, even if unexplained, in the light of the explanation of how the testator was reared, how he lived and how he conducted his business affairs, such testimony loses all probative force and is wholly insufficient to take this case to the jury.

On the matter of suicide, there is no particle of evidence in this record which could lead the jury to the conclusion that at the time John S. Eppinger executed

his will he was incapacitated to know the result of his act or that he anticipated, at that time, taking his own life. When such intention entered his mind cannot be determined from the facts of this case, but if it could, the deliberation with which he went about the preparation of the way that he would take his life makes it clear and unmistakable that he knew the result of his act and knew what he wanted to do. Just when he put the container together wherein his body was found, is not clear but he either had it sawed or sawed it himself to certain dimensions. He put it together himself, he caulked the inside, that is, the seams and cracks, and painted it. He tied down the levers on the fire extinguishers which contained carbon dioxide gas that produces a painless death when sufficiently inhaled. He muzzled the gas nozzles so that the gas would be discharged slowly. He wore the clothing he was accustomed to wearing all the time, climbed into this container by way of a ladder, and was there asphyxiated in accord with the careful preparations which he had made.

The facts of this case fully justified the Trial Court in directing a verdict supporting the will. He must have concluded, as does this Court, the undisputed facts in this case to be that:

(1) John S. Eppinger lived like he wanted to live;

(2) He conducted his affairs in the way and manner that he wanted them conducted;

(3) He did not want others to dictate to him the way and manner he lived or conducted his business affairs;

(4) He had his will prepared and devised his property in the way and manner that he wanted it to go;

(5) He was fully capacitated at the time he made his will to understand what he was doing, to whom he wanted bequests and devises made, and the way and manner in which he wanted the trust administered; and there is no competent or reasonable evidence to the contrary;

and

(6) He died just like he wanted to die, aloof and alone.

So concluding, we must say that there is not one line of evidence in this entire record that indicates the exertion of any undue influence of any kind or character in the execution of his will. To say that such influence was exerted on the testator by attorneys who prepared the will, when this record shows the carefulness, the intelligence, the patience and the determination of both counsel and client to draft an instrument that reflected the wishes of the testator, and the time spent by them in so doing, has no foundation whatsoever.

 We therefore conclude that all assignments of error must be and are overruled, the judgment of the Trial Court affirmed, except as to costs, it appearing to this Court that in view of the fact that the testator committed suicide within two months after the will had been finally executed, the further fact that by the will the testator has set up a trust which may not terminate for approximately 15 years, and it is conceivable that the contest instituted at the time and prosecuted to

this Court may result in some advantage to the estate, and particularly, its administration by said executors and trustees, we think the costs of the case should be paid by the executors and trustees from the assets of the estate of the testator, and that under T. C. A. Sections 20-1601, 20-1602, 20-1621, and the principles announced in Bridges v. Agee, 167 Tenn. 324, 69 S. W. (2d) 891; State ex rel. Wilson v. Bush, 141 Tenn. 229, 208 S. W. 607; Woolfolk v. Woolfolk, 167 Tenn. 362, 69 S. W. (2d) 1089, and Askew v. Mills, 196 Tenn. 527, 268 S. W. (2d) 569, 571, we have authority to assess the costs in our discretion, therefore, all costs will be paid from said testator's estate, including the costs in the lower court, and in this Court.

Since the judgment of the circuit court required the clerk to make out and file a certified copy of the court's order and the original will to the county court of Madison County, the cause is remanded to the circuit court of Madison County, to the end that such order be performed as required by law.

Judgment will be entered in accord with this opinion.

Carney and Bejach, JJ., concur.